# BOARD OF EDUCATION OF CENTRAL SCHOOL DISTRICT NO. 1 ET AL. *v.* ALLEN, COMMISSIONER OF EDUCATION OF NEW YORK, ET AL.

No. 660.   Argued April 22, 1968.—Decided June 10, 1968.

*Marvin E. Pollock* argued the cause for appellants. With him on the brief was *Alan H. Levine.*

*Jean M. Coon,* Assistant Attorney General of New York, argued the cause for appellee Allen. With her on the brief were *Louis J. Lefkowitz,* Attorney General, and *Ruth Kessler Toch,* Solicitor General. *Porter R. Chandler* argued the cause for appellees Rock et al. With him on the brief were *William R. Ball, Richard E. Nolan,* and *James J. MacKrell.*

Briefs of *amici curiae,* urging reversal, were filed by *Leo Pfeffer, Arnold Forster, Edwin J. Lukas, Paul Hartman, Sol Rabkin,* and *Joseph B. Robison* for the American Jewish Committee et al., and by *Franklin C. Salisbury* for Protestants and Other Americans United for Separation of Church and State.

Briefs of *amici curiae,* urging affirmance, were filed by *Solicitor General Griswold, Assistant Attorney General Weisl, Lawrence G. Wallace, Alan S. Rosenthal,* and *Robert V. Zener* for the United States; by *Herbert F. DeSimone,* Attorney General of Rhode Island, *Charles G. Edwards,* Assistant Attorney General, *William C. Sen-*

*nett,* Attorney General of Pennsylvania, *James L. Oakes,* Attorney General of Vermont, *Robert C. Londerholm,* Attorney General of Kansas, *William B. Saxbe,* Attorney General of Ohio, and *Joe T. Patterson,* Attorney General of Mississippi; by *Jack P. F. Gremillion,* Attorney General, for the State of Louisiana; by *Boston E. Witt,* Attorney General, and *Myles E. Flint,* Assistant Attorney General, for the State of New Mexico; by *Ethan A. Hitchcock* for the National Association of Independent Schools, Inc.; by *R. Raber Taylor, Stuart D. Hubbell,* and *Herman Cahn* for Citizens for Educational Freedom; by *Edward C. Maguire* for the New York State AFL–CIO; by *Thomas J. Ford, Edward J. Walsh, Jr.,* and *George S. Eaton* for the Long Island Conference of Religious Elementary and Secondary School Administrators; by *Charles M. Whelan, W. R. Consedine, Alfred L. Scanlan,* and *Harmon Burns* for the National Catholic Educational Association et al.; by *Julius Berman* for the National Jewish Commission on Law and Public Affairs, and by *James P. Brown* for the Lutheran Church-Missouri Synod.

Mr. Justice White delivered the opinion of the Court.

A law of the State of New York requires local public school authorities to lend textbooks free of charge to all students in grades seven through 12; students attending private schools are included. This case presents the question whether this statute is a "law respecting an establishment of religion, or prohibiting the free exercise thereof," and so in conflict with the First and Fourteenth Amendments to the Constitution, because it authorizes the loan of textbooks to students attending parochial schools. We hold that the law is not in violation of the Constitution.

Until 1965, § 701 of the Education Law of the State of New York authorized public school boards to designate

textbooks for use in the public schools, to purchase such books with public funds, and to rent or sell the books to public school students.[1] In 1965 the Legislature amended § 701, basing the amendments on findings that the "public welfare and safety require that the state and local communities give assistance to educational programs which are important to our national defense and the general welfare of the state."[2] Beginning with the 1966–1967 school year, local school boards were required to purchase textbooks and lend them without charge "to all children residing in such district who are enrolled in grades seven to twelve of a public or private school which complies with the compulsory education law." The books now loaned are "text-books which are designated for use in any public, elementary or secondary schools of the state or are approved by any boards of education," and which—according to a 1966 amendment—"a pupil is required to use as a text for a semester or more in a particular class in the school he legally attends."[3]

[1] New York Sess. Laws 1950, c. 239, § 1. New York Education Law § 703, New York Sess. Laws 1950, c. 239, § 3, permitted the qualified voters of any school district to authorize a special tax for the purpose of making available free textbooks. The 1965 amendments that required free textbooks to be provided for grades seven through 12 amended § 703 so that it now permits local voters to approve free books for grades one through six.

[2] New York Sess. Laws 1965, c. 320, § 1.

[3] New York Education Law § 701 (1967 Supp.):

"1. In the several cities and school districts of the state, boards of education, trustees or such body or officer as perform the functions of such boards, shall designate text-books to be used in the schools under their charge.

"2. A text-book, for the purposes of this section shall mean a book which a pupil is required to use as a text for a semester or more in a particular class in the school he legally attends.

"3. In the several cities and school districts of the state, boards of education, trustees or such body or officers as perform the function of such boards shall have the power and duty to purchase and

Appellant Board of Education of Central School District No. 1 in Rensselaer and Columbia Counties, brought suit in the New York courts against appellee James Allen.[4] The complaint alleged that § 701 violated both the State and Federal Constitutions; that if appellants, in reliance on their interpretation of the Constitution, failed to lend books to parochial school students within their counties appellee Allen would remove appellants from office; and that to prevent this, appellants were complying with the law and submitting to their constituents a school budget including funds for books to be lent to parochial school pupils. Appellants therefore sought a declaration that § 701 was invalid, an order barring appellee Allen from removing appellants from office for failing to comply with it, and another order restraining him from apportioning state funds to school districts for the purchase of textbooks to be lent to parochial students. After answer, and upon cross-motions for summary judgment, the trial court held the law un-

to loan upon individual request, to all children residing in such district who are enrolled in grades seven to twelve of a public or private school which complies with the compulsory education law, text-books. Text-books loaned to children enrolled in grades seven to twelve of said private schools shall be text-books which are designated for use in any public, elementary or secondary schools of the state or are approved by any boards of education, trustees or other school authorities. Such text-books are to be loaned free to such children subject to such rules and regulations as are or may be prescribed by the board of regents and such boards of education, trustees or other school authorities."

The present subdivision 2 was added by amendment in 1966, New York Sess. Laws 1966, c. 795. This suit was filed, and the trial court opinion was rendered, prior to the 1966 amendment.

[4] Intervention was permitted on plaintiffs' side by the Board of Education of Union Free School District No. 3 in Nassau County, which appears here as co-appellant, and on defendants' side by parents of certain students attending private schools, who appear here as co-appellees.

constitutional under the First and Fourteenth Amendments and entered judgment for appellants. 51 Misc. 2d 297, 273 N. Y. S. 2d 239 (1966). The Appellate Division reversed, ordering the complaint dismissed on the ground that appellant school boards had no standing to attack the validity of a state statute. 27 App. Div. 2d 69, 276 N. Y. S. 2d 234 (1966). On appeal, the New York Court of Appeals concluded by a 4–3 vote that appellants did have standing [5] but by a different 4–3 vote held that § 701 was not in violation of either the State or the Federal Constitution. 20 N. Y. 2d 109, 228 N. E. 2d 791, 281 N. Y. S. 2d 799 (1967). The Court of Appeals said that the law's purpose was to benefit all school children, regardless of the type of school they attended, and that only textbooks approved by public school authorities could be loaned. It therefore considered § 701 "completely neutral with respect to religion, merely making available secular textbooks at the request of the individual student and asking no question about what school he attends." Section 701, the Court of Appeals concluded, is not a law which "establishes a religion or constitutes the use of public funds to aid religious schools." 20 N. Y. 2d, at 117; 228 N. E. 2d, at 794, 795; 281 N. Y. S. 2d, at 805. We noted probable jurisdiction. 389 U. S. 1031 (1968).

*Everson* v. *Board of Education,* 330 U. S. 1 (1947), is the case decided by this Court that is most nearly in

---

[5] Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation. *Baker* v. *Carr,* 369 U. S. 186, 204 (1962).

point for today's problem. New Jersey reimbursed parents for expenses incurred in busing their children to parochial schools. The Court stated that the Establishment Clause bars a State from passing "laws which aid one religion, aid all religions, or prefer one religion over another," and bars too any "tax in any amount, large or small . . . levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." 330 U. S., at 15–16. Nevertheless, said the Court, the Establishment Clause does not prevent a State from extending the benefits of state laws to all citizens without regard for their religious affiliation and does not prohibit "New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools." The statute was held to be valid even though one of its results was that "children are helped to get to church schools" and "some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets." 330 U. S., at 17. As with public provision of police and fire protection, sewage facilities, and streets and sidewalks, payment of bus fares was of some value to the religious school, but was nevertheless not such support of a religious institution as to be a prohibited establishment of religion within the meaning of the First Amendment.

*Everson* and later cases have shown that the line between state neutrality to religion and state support of religion is not easy to locate. "The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, is one of degree." *Zorach* v. *Clauson,* 343 U. S. 306, 314 (1952). See *McGowan* v. *Maryland,* 366 U. S. 420 (1961). Based

on *Everson, Zorach, McGowan,* and other cases, *Abington School District* v. *Schempp,* 374 U. S. 203 (1963), fashioned a test subscribed to by eight Justices for distinguishing between forbidden involvements of the State with religion and those contacts which the Establishment Clause permits:

> "The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. *Everson* v. *Board of Education. . . ."* 374 U. S., at 222.

This test is not easy to apply, but the citation of *Everson* by the *Schempp* Court to support its general standard made clear how the *Schempp* rule would be applied to the facts of *Everson.* The statute upheld in *Everson* would be considered a law having "a secular legislative purpose and a primary effect that neither advances nor inhibits religion." We reach the same result with respect to the New York law requiring school books to be loaned free of charge to all students in specified grades. The express purpose of § 701 was stated by the New York Legislature to be furtherance of the educational opportunities available to the young. Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are fur-

nished to parochial schools, and the financial benefit is to parents and children, not to schools.[6] Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution.

Of course books are different from buses. Most bus rides have no inherent religious significance, while religious books are common. However, the language of § 701 does not authorize the loan of religious books, and the State claims no right to distribute religious literature. Although the books loaned are those required by the parochial school for use in specific courses, each book

---

[6] While the record and the state court opinions in this case contained no information about how the books are in fact transferred from the Boards of Education to individual students, both parties suggested in their briefs and on oral argument before this Court that New York permits private schools to submit to boards of education summaries of the requests for textbooks filed by individual students, and also permits private schools to store on their premises the textbooks being loaned by the Board of Education to the students. This interpretation of the State's administrative procedure is supported by an "Opinion of Counsel" made available by the Board of Regents and the State Department of Education to local school superintendents. For purposes of this case we consider the New York statute to permit these procedures. So construing the statute, we find it in conformity with the Constitution, for the books are furnished for the use of individual students and at their request.

It should be noted that the record contains no evidence that any of the private schools in appellants' districts previously provided textbooks for their students. There is some evidence that at least some of the schools did not: intervenor defendants asserted that they had previously purchased all their children's textbooks. And see statement of then Commissioner of Education Keppel: "Nonpublic schools rarely provide free textbooks." Hearings on Elementary and Secondary Education Act of 1965 before General Subcommittee on Education of House Committee on Education and Labor, 89th Cong., 1st Sess., Pt. 1, 93 (1965).

loaned must be approved by the public school authorities; only secular books may receive approval. The law was construed by the Court of Appeals of New York as "merely making available secular textbooks at the request of the individual student," *supra,* and the record contains no suggestion that religious books have been loaned. Absent evidence, we cannot assume that school authorities, who constantly face the same problem in selecting textbooks for use in the public schools, are unable to distinguish between secular and religious books or that they will not honestly discharge their duties under the law. In judging the validity of the statute on this record we must proceed on the assumption that books loaned to students are books that are not unsuitable for use in the public schools because of religious content.

The major reason offered by appellants for distinguishing free textbooks from free bus fares is that books, but not buses, are critical to the teaching process, and in a sectarian school that process is employed to teach religion. However this Court has long recognized that religious schools pursue two goals, religious instruction and secular education. In the leading case of *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), the Court held that although it would not question Oregon's power to compel school attendance or require that the attendance be at an institution meeting State-imposed requirements as to quality and nature of curriculum, Oregon had not shown that its interest in secular education required that all children attend publicly operated schools. A premise of this holding was the view that the State's interest in education would be served sufficiently by reliance on the secular teaching that accompanied religious training in the schools maintained by the Society of Sisters. Since *Pierce,* a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance

laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction.[7] Indeed, the State's interest in assuring that these standards are being met has been considered a sufficient reason for refusing to accept instruction at home as compliance with com-

---

[7] This Court has twice suggested the constitutionality of these state regulations. "[T]he State may 'require teaching by instruction and study of all in our history and in the structure and organization of our government, including the guaranties of civil liberty, which tend to inspire patriotism and love of country.'" *West Virginia State Board of Education* v. *Barnette*, 319 U. S. 624, 631 (1943), quoting *Minersville School District* v. *Gobitis*, 310 U. S. 586, 604 (1940) (Stone, J., dissenting). "This Court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements which the state has power to impose." *Everson* v. *Board of Education*, 330 U. S. 1, 18 (1947) (citing *Pierce* v. *Society of Sisters*). A great many state cases have upheld a wide range of private school regulation. *E. g., Meyerkorth* v. *State*, 173 Neb. 889, 115 N. W. 2d 585 (1962), appeal dismissed for want of a substantial federal question, 372 U. S. 705 (1963); *State* v. *Hoyt*, 84 N. H. 38, 146 A. 170 (1929); *People* v. *Donner*, 199 Misc. 643, 99 N. Y. S. 2d 830 (Dom. Rel. Ct. 1950), aff'd mem., 278 App. Div. 705, 103 N. Y. S. 2d 757, aff'd mem., 302 N. Y. 857, 100 N. E. 2d 48, appeal dismissed for want of a substantial federal question, 342 U. S. 884 (1951).

New York State regulates private schools extensively, especially as to attendance and curriculum. New York Education Law §§ 3201–3229 (1953). Regents examinations are given to private school students. *Id.,* § 209. The basic requirement is that the instruction given in private schools satisfying the compulsory attendance law be "at least substantially equivalent to the instruction given to minors of like age and attainments at the public schools of the city or district where the minor resides." *Id.,* § 3204 subd. 2.

New York requires school attendance of "each minor from seven to sixteen years of age" unless he has completed high school. *Id.,* § 3205.

pulsory education statutes.[8]  These cases were a  sensible corollary of *Pierce* v. *Society of Sisters:* if the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function.  Another corollary was *Cochran* v. *Louisiana State Board of Education,* 281 U. S. 370 (1930), where appellants said that a statute requiring school books to be furnished without charge to all students, whether they attended public or private schools, did not serve a "public purpose," and so offended the Fourteenth Amendment.  Speaking through Chief Justice Hughes, the Court summarized as follows its conclusion that Louisiana's interest in the secular education being provided by private schools made provision of textbooks to students in those schools a properly public concern: "[The State's] interest is education, broadly; its method, comprehensive.  Individual interests are aided only as the common interest is safeguarded."  281 U. S., at 375.

Underlying these cases, and underlying also the legislative judgments that have preceded the court decisions, has been a recognition that private education has played and is playing a significant and valuable role in raising national levels of knowledge, competence, and experience. Americans care about the quality of the secular education available to their children.  They have considered high quality education to be an indispensable ingredient for achieving the kind of nation, and the kind of citizenry, that they have desired to create.  Considering this attitude, the continued willingness to rely on private school systems, including parochial systems, strongly suggests

---

[8] *E. g., People* v. *Turner*, 121 Cal. App. 2d 861, 263 P. 2d 685 (1953), appeal dismissed for want of a substantial federal question, 347 U. S. 972 (1954).

that a wide segment of informed opinion, legislative and otherwise, has found that those schools do an acceptable job of providing secular education to their students.[9] This judgment is further evidence that parochial schools are performing, in addition to their sectarian function, the task of secular education.

Against this background of judgment and experience, unchallenged in the meager record before us in this case, we cannot agree with appellants either that all teaching in a sectarian school is religious or that the processes of secular and religious training are so intertwined that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion. This case comes to us after summary judgment entered on the pleadings. Nothing in this record supports the proposition that all textbooks, whether they deal with mathematics, physics, foreign languages, history, or literature, are used by the parochial schools to teach religion. No evidence has been offered about particular schools, particular courses, particular teachers, or particular books. We are unable to hold, based solely on judicial notice, that this statute results in unconstitutional involvement of the State with religious instruction or that § 701, for this or the other reasons urged, is a law respecting the establishment of religion within the meaning of the First Amendment.

Appellants also contend that § 701 offends the Free Exercise Clause of the First Amendment. However, "it is necessary in a free exercise case for one to show the

---

[9] In 1965–1966 in New York State, over 900,000 students, or 22.2% of total state enrollment, attended nonpublic schools. University of State of New York, Education Statistics Estimates 1966–67, Table I (1966). The comparable statistic for the Nation was at least 10%. United States Bureau of the Census, Statistical Abstract of the United States: 1967, at 111 (1967).

coercive effect of the enactment as it operates against him in the practice of his religion," *Abington School District* v. *Schempp*, 374 U. S. 203, 223 (1963), and appellants have not contended that the New York law in any way coerces them as individuals in the practice of their religion.

*The judgment is affirmed.*

Mr. Justice Harlan, concurring.

Although I join the opinion and judgment of the Court, I wish to emphasize certain of the principles which I believe to be central to the determination of this case, and which I think are implicit in the Court's decision.

The attitude of government toward religion must, as this Court has frequently observed, be one of neutrality. Neutrality is, however, a coat of many colors. It requires that "government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief." *Abington School District* v. *Schempp*, 374 U. S. 203, 305 (concurring opinion of Goldberg, J.). Realization of these objectives entails "no simple and clear measure," *id.*, at 306, by which this or any case may readily be decided, but these objectives do suggest the principles which I believe to be applicable in the present circumstances. I would hold that where the contested governmental activity is calculated to achieve nonreligious purposes otherwise within the competence of the State, and where the activity does not involve the State "so significantly and directly in the realm of the sectarian as to give rise to . . . divisive influences and inhibitions of freedom," *id.*, at 307, it is not forbidden by the religious clauses of the First Amendment.

In my opinion, § 701 of the Education Law of New York does not employ religion as its standard for action or inaction, and is not otherwise inconsistent with these principles.

MR. JUSTICE BLACK, dissenting.

The Court here affirms a judgment of the New York Court of Appeals which sustained the constitutionality of a New York law providing state tax-raised funds to supply school books for use by pupils in schools owned and operated by religious sects. I believe the New York law held valid is a flat, flagrant, open violation of the First and Fourteenth Amendments which together forbid Congress or state legislatures to enact any law "respecting an establishment of religion." For that reason I would reverse the New York Court of Appeals' judgment. This, I am confident, would be in keeping with the deliberate statement we made in *Everson* v. *Board of Education*, 330 U. S. 1, 15–16 (1947), and repeated in *McCollum* v. *Board of Education*, 333 U. S. 203, 210–211 (1948), that:

"Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious

organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' "

The *Everson* and *McCollum* cases plainly interpret the First and Fourteenth Amendments as protecting the taxpayers of a State from being compelled to pay taxes to their government to support the agencies of private religious organizations the taxpayers oppose. To authorize a State to tax its residents for such church purposes is to put the State squarely in the religious activities of certain religious groups that happen to be strong enough politically to write their own religious preferences and prejudices into the laws. This links state and churches together in controlling the lives and destinies of our citizenship—a citizenship composed of people of myriad religious faiths, some of them bitterly hostile to and completely intolerant of the others. It was to escape laws precisely like this that a large part of the Nation's early immigrants fled to this country. It was also to escape such laws and such consequences that the First Amendment was written in language strong and clear barring passage of any law "respecting an establishment of religion."

It is true, of course, that the New York law does not as yet formally adopt or establish a state religion. But it takes a great stride in that direction and coming events cast their shadows before them. The same powerful sectarian religious propagandists who have succeeded in securing passage of the present law to help religious schools carry on their sectarian religious purposes can and doubtless will continue their propaganda, looking toward complete domination and supremacy of their particular brand of religion.[1]  And it nearly always is

---

[1] See dissenting opinion of MR. JUSTICE DOUGLAS, *post*, p. 254.

by insidious approaches that the citadels of liberty are most successfully attacked.[2]

I know of no prior opinion of this Court upon which the majority here can rightfully rely to support its holding this New York law constitutional. In saying this, I am not unmindful of the fact that the New York Court of Appeals purported to follow *Everson* v. *Board of Education, supra,* in which this Court, in an opinion written by me, upheld a New Jersey law authorizing reimbursement to parents for the transportation of children attending sectarian schools. That law did not attempt to deny the benefit of its general terms to children of any faith going to any legally authorized school. Thus, it was treated in the same way as a general law paying the streetcar fare *of all school children,* or a law providing midday lunches for all children or all school children, or a law to provide police protection for children going to and from school, or general laws to provide police and fire protection for buildings, including, of course, churches and church school buildings as well as others.

As my Brother Douglas so forcefully shows, in an argument with which I fully agree, upholding a State's power to pay bus or streetcar fares for school children cannot provide support for the validity of a state law using tax-raised funds to buy school books for a religious school. The First Amendment's bar to establishment of religion must preclude a State from using funds levied from all of its citizens to purchase books for use by sectarian schools, which, although "secular," realistically will in some way inevitably tend to propagate the religious views of the favored sect. Books are the most essential tool of education since they contain the resources of knowledge which the educational process is designed to exploit. In this·sense it is not difficult

---

[2] See *Boyd* v. *United States,* 116 U. S. 616.

to distinguish books, which are the heart of any school, from bus fares, which provide a convenient and helpful general public transportation service. With respect to the former, state financial support actively and directly assists the teaching and propagation of sectarian religious viewpoints in clear conflict with the First Amendment's establishment bar; with respect to the latter, the State merely provides a general and nondiscriminatory transportation service in no way related to substantive religious views and beliefs.

This New York law, it may be said by some, makes but a small inroad and does not amount to complete state establishment of religion. But that is no excuse for upholding it. It requires no prophet to foresee that on the argument used to support this law others could be upheld providing for state or federal government funds to buy property on which to erect religious school buildings or to erect the buildings themselves, to pay the salaries of the religious school teachers, and finally to have the sectarian religious groups cease to rely on voluntary contributions of members of their sects while waiting for the Government to pick up all the bills for the religious schools. Arguments made in favor of this New York law point squarely in this direction, namely, that the fact that government has not heretofore aided religious schools with tax-raised funds amounts to a discrimination against those schools and against religion. And that there are already efforts to have government supply the money to erect buildings for sectarian religious schools is shown by a recent Act of Congress which apparently allows for precisely that. See Higher Education Facilities Act of 1963, 77 Stat. 363, 20 U. S. C. § 701 *et seq.*

I still subscribe to the belief that tax-raised funds cannot constitutionally be used to support religious schools, buy their school books, erect their buildings, pay their

teachers, or pay any other of their maintenance expenses, even to the extent of one penny. The First Amendment's prohibition against governmental establishment of religion was written on the assumption that state aid to religion and religious schools generates discord, disharmony, hatred, and strife among our people, and that any government that supplies such aids is to that extent a tyranny. And I still believe that the only way to protect minority religious groups from majority groups in this country is to keep the wall of separation between church and state high and impregnable as the First and Fourteenth Amendments provide. The Court's affirmance here bodes nothing but evil to religious peace in this country.

MR. JUSTICE DOUGLAS, dissenting.

We have for review a statute which authorizes New York State to supply textbooks to students in parochial as well as in public schools. The New York Court of Appeals sustained the law on the grounds that it involves only "secular textbooks" and that that type of aid falls within *Everson v. Board of Education,* 330 U. S. 1,[1] where a divided Court upheld a state law which made bus service available to students in parochial schools as well as to students in public schools. 20 N. Y. 2d 109, 228 N. E. 2d 791, 281 N. Y. S. 2d 799.

The statute on its face empowers each parochial school to determine for itself which textbooks will be eligible for loans to its students, for the Act provides that the

---

[1] *Everson,* relied on by the Court of Appeals of New York, did not involve textbooks and did not present the serious problems raised by a form of aid to parochial students which injects religious issues into the choice of curriculum. In the only decision of this Court upholding a state grant of textbooks to sectarian school students, *Cochran v. Board of Education,* 281 U. S. 370, the First Amendment issue was not raised. See *id.,* at 370–373; *Everson v. Board of Education,* 330 U. S. 1, 29, n. 3 (dissenting opinion).

only text which the State may provide is "a book which a pupil is required to use as a text for a semester or more in a particular class in the school he legally attends." New York Education Law § 701, subd. 2. This initial and crucial selection is undoubtedly made by the parochial school's principal or its individual instructors, who are, in the case of Roman Catholic schools, normally priests or nuns.

The next step under the Act is an "individual request" for an eligible textbook (§ 701, subd. 3), but the State Education Department has ruled that a pupil may make his request to the local public board of education through a "private school official." [2] Local boards have accordingly provided for those requests to be made by the individual or "by groups or classes." [3] And forms for textbook requisitions to be filled out by the head of the private school are provided.[4]

The role of the local public school board is to decide whether to veto the selection made by the parochial school. This is done by determining first whether the text has been or should be "approved" for use in public schools and second whether the text is "secular," "nonreligious," or "non-sectarian." [5] The local boards ap-

---

[2] Letter from Herbert F. Johnson, State Education Department, to City, Village and District Superintendents & Supervising Principals, ¶ 5, Jan. 10, 1966, reproduced in Brief for American Jewish Committee et al. as *Amici Curiae*, at 43, 44.

[3] Manual of Instructions on Recordkeeping Procedures for Textbooks Loaned in Conformance With Provisions of the New York State Textbook Law ¶ 2.3 (1967), reproduced in Brief for National Jewish Commission on Law and Public Affairs as *Amicus Curiae*, at 24, 25.

[4] See Appendix A to this opinion.

[5] The State Court of Appeals used the phrases "secular textbooks" and "nonreligious textbooks" without any elaboration as to what was meant. 20 N. Y. 2d, at 117, 228 N. E. 2d, at 794–795, 281 N. Y. S. 2d, at 805. The legislature, in its "statement of policy" to the Act (Laws of 1965, c. 320, § 1), speaks of aiding instruction

parently have broad discretion in exercising this veto power.[6]

Thus the statutory system provides that the parochial school will ask for the books that it wants. Can there be the slightest doubt that the head of the parochial school will select the book or books that best promote its sectarian creed?

If the board of education supinely submits by approving and supplying the sectarian or sectarian-oriented textbooks, the struggle to keep church and state separate has been lost. If the board resists, then the battle line between church and state will have been drawn and the contest will be on to keep the school board independent or to put it under church domination and control.

---

in "non-sectarian subjects," and gives as examples "science, mathematics, [and] foreign languages." The State Department of Education has stated that "it is necessary that . . . [t]he textbooks be non-sectarian (this eliminates denominational editions and those carrying the 'imprimatur' or 'nihil obstat' of a religious authority) . . . ." Opinion of Counsel No. 181. There are no other definitions to be found.

The Court was advised at oral argument by the Assistant Attorney General that Opinion of Counsel No. 181 is advisory only and not binding. It would state the policy of the New York Department of Education in event of an appeal to it by a taxpayer of a local board's decision that a certain text was "non-sectarian" or should be "approved." The Regents of the University of the State of New York, who have the last word on such matters and are specifically authorized by § 701, subd. 3, to promulgate regulations respecting the textbook loan program, have not done so, and their position on what is "non-sectarian" is unknown.

[6] For example the regulations of the Board of Education of the City of New York respecting approval of textbooks for public schools contain no limitations directly relevant to the question of sectarianism. The material is to "promote the objectives of the educational program," "treat the subject competently and accurately," "be in good taste," "have a wholesome tone that is consonant with right conduct and civic values," "be in harmony with American democratic ideals and moral values," "be free of any reflection on the dignity and status of any group, race, or religion,

Whatever may be said of *Everson,* there is nothing ideological about a bus. There is nothing ideological about a school lunch, or a public nurse, or a scholarship. The constitutionality of such public aid to students in parochial schools turns on considerations not present in this textbook case. The textbook goes to the very heart of education in a parochial school. It is the chief, although not solitary, instrumentality for propagating a particular religious creed or faith. How can we possibly approve such state aid to a religion? A parochial school textbook may contain many, many more seeds of creed and dogma than a prayer. Yet we struck down in *Engel* v. *Vitale,* 370 U. S. 421, an official New York prayer for its public schools, even though it was not plainly denominational. For we emphasized the violence done the Establishment Clause when the power was given religious-political groups "to write their own prayers into law." *Id.,* at 427. That risk is compounded here by giving parochial schools the initiative in selecting the textbooks they desire to be furnished at public expense.

Judge Van Voorhis, joined by Chief Judge Fuld and Judge Breitel, dissenting below, said that the difficulty with the textbook loan program "is that there is no reliable standard by which secular and religious textbooks

---

whether expressed or implied, by statement or omission," and "be free of objectionable features of over-dramatization, violence, or crime." Guiding Principles for Schools in the Selection and Use of "Non-Listed" Instructional Materials (1952). Opinion of Counsel No. 181 (see n. 5, *supra*) simply states that the local board, if it finds that no other board has approved the text in question, should "decide if it wishes to approve the same itself." This opinion of counsel also states that if the board is in doubt as to whether a text is "non-sectarian," that is whether it carries an imprimatur or nihil obstat or is a denominational edition, it "must make the appropriate determination."

can be distinguished from each other." 20 N. Y. 2d, at 122, 228 N. E. 2d, at 798, 281 N. Y. S. 2d, at 809. The New York Legislature felt that science was a non-sectarian subject (see n. 5, *supra*). Does this mean that any general science textbook intended for use in grades 7–12 may be provided by the State to parochial school students? May John M. Scott's Adventures in Science (1963) be supplied under the textbook loan program? This book teaches embryology in the following manner:

> "To you an animal usually means a mammal, such as a cat, dog, squirrel, or guinea pig. The new animal or embryo develops inside the body of the mother until birth. The fertilized egg becomes an embryo or developing animal. Many cell divisions take place. In time some cells become muscle cells, others nerve cells or blood cells, and organs such as eyes, stomach, and intestine are formed.
>
> "The body of a human being grows in the same way, but it is much more remarkable than that of any animal, for the embryo has a human soul infused into the body by God. Human parents are partners with God in creation. They have very great powers and great responsibilities, for through their coopera-tion with God souls are born for heaven." (At 618–619.)[7]

Comparative economics would seem to be a nonsec-tarian subject. Will New York, then, provide Arthur J. Hughes' general history text, Man in Time (1964), to

---

[7] Although the author of this textbook is a priest, the text con-tains no imprimatur and no nihil obstat. Although published by a Catholic press, the Loyola University Press, Chicago, it is not marked in any manner as a "denominational edition," but is simply the general edition of the book. Accordingly, under Opinion of Counsel No. 181, the only document approaching a "regulation" on the issue involved here, Adventures in Science would qualify as "non-sectarian." See nn. 5, 6, *supra*.

parochial school students? It treats that topic in this manner:

> "Capitalism is an economic system based on man's right to private property and on his freedom to use that property in producing goods which will earn him a just profit on his investment. Man's right to private property stems from the Natural Law implanted in him by God. It is as much a part of man's nature as the will to self-preservation." (At 560.)
>
> "The broadest definition of socialism is government ownership of all the means of production and distribution in a country. . . . Many, but by no means all, Socialists in the nineteenth century believed that crime and vice existed because poverty existed, and if poverty were eliminated, then crime and vice would disappear. While it is true that poor surroundings are usually unhealthy climates for high moral training, still, man has the free will to check himself. Many Socialists, however, denied free will and said that man was a creation of his environment. . . . If Socialists do not deny Christ's message, they often ignore it. Christ showed us by His life that this earth is a testing ground to prepare man for eternal happiness. Man's interests should be in this direction at least part of the time and not always directed toward a futile quest for material goods." (At 561–564.)[8]

Mr. Justice Jackson said, ". . . I should suppose it is a proper, if not an indispensable, part of preparation for a

---

[8] Man In Time contains a nihil obstat and an imprimatur. Thus, if Opinion of Counsel No. 181 (see nn. 5, 6, *supra*) is applicable, this book may not be provided by the State. The Opinion of Counsel, however, is only "advisory," we are told; moreover, the religious endorsements could easily be removed by the author and publisher at the next printing.

worldly life to know the roles that religion and religions have played in the tragic story of mankind." *McCollum v. Board of Education,* 333 U. S. 203, 236 (concurring opinion). Yet, as he inquired, what emphasis should one give who teaches the Reformation, the Inquisition, or the early effort in New England to establish " 'a Church without a Bishop and a State without a King?' " *Ibid.* What books should be chosen for those subjects?

Even where the treatment given to a particular topic in a school textbook is not blatantly sectarian, it will necessarily have certain shadings that will lead a parochial school to prefer one text over another.[9]

The Crusades, for example, may be taught as a Christian undertaking to "save the Holy Land" from the Moslem Turks who "became a threat to Christianity and its holy places," which "they did not treat . . . with respect"

[9] Some parochial schools may prefer those texts which are liberally sprinkled with religious vignettes. This creeping sectarianism avoids the direct teaching of religious doctrine but keeps the student continually reminded of the sectarian orientation of his education. In P. Furlong, Sr. Margaret, & D. Sharkey's American history text, America Yesterday (1963), for example, the student is informed that the first mass to be said in what is now the United States was in 1526 near Chesapeake Bay, that eight French missionaries to Canada in the early 1600's were canonized in 1930, that one of the men who signed the Declaration of Independence and two who attended the Constitutional Convention were Catholic, and that the superintendent of the Hudson Bay Company's outpost in the Oregon country converted to Catholicism in 1842. At 26, 73–74, 102, 140, 235. And J. Scott's Adventures in Science (1963), in teaching the atmospheric conditions prevailing at the top of Mount Everest, informs the student that when Sir Edmund Hillary first scaled this peak he placed there a "tiny crucifix" which a Benedictine monk had supplied. At 72.

America Yesterday, *supra,* is another example of a text written by the clergy (here a priest and nun together with one layman) that contains no imprimatur and no nihil obstat and is not a denominational edition. See nn. 5–7.

(H. Wilson, F. Wilson, B. Erb & E. Clucas, Out of the Past 284 (1954)), or as essentially a series of wars born out of political and materialistic motives (see G. Leinwand, The Pageant of World History 136–137 (1965)).

Is the dawn of man to be explained in the words, "God created man and made man master of the earth" (P. Furlong, The Old World and America 5 (1937)), or in the language of evolution (see T. Wallbank, Man's Story 32–35 (1961))?

Is the slaughter of the Aztecs by Cortes and his entourage to be lamented for its destruction of a New World culture (see J. Caughey, J. Franklin, & E. May, Land of the Free 27–28 (1965)), or forgiven because the Spaniards "carried the true Faith" to a barbaric people who practiced human sacrifice (see P. Furlong, Sr. Margaret, & D. Sharkey, America Yesterday 17, 34 (1963))?

Is Franco's revolution in Spain to be taught as a crusade against anti-Catholic forces (see R. Hoffman, G. Vincitorio, & M. Swift, Man and His History 666–667 (1958))[10] or as an effort by reactionary elements to regain control of that country (see G. Leinwand, The Pageant of World History, *supra*, at 512)?[11] Is the expansion of

---

[10] "In Spain early in 1936 a popular-front organization won a victory in the national elections. The result was a government made up of discordant political elements that failed to preserve civil order in the country. Violent anti-Catholics attacked and burned churches and monasteries, and the government did not even try to prevent these crimes. As a result, Spaniards who loved their country and were loyal to their religion revolted against the popular-front government of the republic. An able general, Francisco Franco, put himself at the head of the revolt, which began in July 1936."

[11] "Spain, at the end of World War I, was a backward, poverty-stricken monarchy. In 1931, the king resigned and the people established a republic. The Spanish tried many reforms, but there were many who wanted to go back to the old ways and old privileges of the monarchy. Those who were rich wanted to hold on to

communism in select areas of the world a manifestation of the forces of Evil campaigning against the forces of Good? See A. Hughes, Man in Time, *supra*, at 565–568, 666–669, 735–748.

It will be often difficult, as Mr. Justice Jackson said, to say "where the secular ends and the sectarian begins in education." *McCollum* v. *Board of Education*, 333 U. S., at 237–238. But certain it is that once the so-called "secular" textbook is the prize to be won by that religious faith which selects the book, the battle will be on for those positions of control. Judge Van Voorhis expressed the fear that in the end the state might dominate the church. Others fear that one sectarian group, gaining control of the state agencies which approve the "secular" textbooks, will use their control to disseminate ideas most congenial to their faith. It must be remembered that the very existence of the religious school—whether Catholic or Mormon, Presbyterian or Episcopalian—is to provide an education oriented to the dogma of the particular faith.[12]

---

their property. These people thought that Francisco Franco, a Fascist, could help them.

"In 1936, a civil war started which soon came to be called a 'dress rehearsal' for World War II because the Fascist countries of Italy and Germany supported Franco and his rebels. On the other hand, Russia supported the loyalists (as the armies of the republic were called). The democratic countries might have supported the loyalists, too, but fear of communism prevented them from doing so. Franco defeated the loyalists and, in 1938, became dictator of Spain and today as *El Caudillo* ('The Leader') still rules Spain with an iron hand."

[12] The purpose of the parochial school in the beginning is clear beyond peradventure. The generally held Roman Catholic position in the matter of education in public and parochial schools has been well summarized by the late Monsignor John A. Ryan (1869–1945):

" 'As a matter of fact, the State maintains a system of schools which is not completely satisfactory to Catholics, inasmuch as no

Father Peter O'Reilly put the matter succinctly when he disclosed what was happening in one Catholic school: [13] "On February 24, 1954, Rev. Cyril F. Meyer, C. M., then Vice President of the University, sent the following letter to all the faculty, both Catholics and non-Catholics, even those teaching law, science, and mathematics:

" 'Dear Faculty Member:

" 'As a result of several spirited discussions in the Academic Senate, a resolution was passed by that body that a self-evaluation be made of the effectiveness with which we are achieving in our classrooms the stated objectives of the University. . . . The primacy of the spiritual is the reason for a Christian university. Our goal is not merely to equip students with marketable skills. It is far above this—to educate man, the whole man, the theocentric man. As you are well aware, we strive to educate not only for personal and social success in secular society, but far more for leadership toward a theocentric society. . . .

---

place is given to morality and religion. Since the Church realizes that the teaching of religion and instruction in the secular branches cannot rightfully or successfully be separated one from the other, she is compelled to maintain her own system of schools for general education as well as for religious instruction. . . .' " 2 A. Stokes, Church and State in the United States 654 (1950).

"The education in the parochial schools follows in general the curriculum in the public schools, the main differences being that about 15 per cent of the time is given to religious instruction, and that the Catholic point of view is brought out in the treatment of historical and other subjects, just as the Protestant point of view might be emphasized in a Protestant school." *Ibid.*

Some, however, think that some parochial schools are changing their character under practical pressures of educational competition. See, *e. g.,* Fleming, Fordham Is Trying to be catholic With a Small "c," N. Y. Times Magazine, Dec. 10, 1967, p. 32.

[13] St. John's I: A Chronicle of Folly, 4 Continuum 223, 233–234 (1966).

" 'May I, therefore, respectfully request that you submit answers as specific as possible to the following questions:

" '1. What do you do to make your particular courses theocentric?

" '2. Do you believe there is anything the Administration or your colleagues can do to assist you in presenting your particular courses more "according to the philosophical and theological traditions of the Roman Catholic Church"? Do not hesitate to let us know. There is no objective of our University more fundamental than this. We must all be aware that "the classroom that is not a temple is a den."

" 'Please try to have your answers, using this size paper, returned to me by March 10.' "

This tendency is no Catholic monopoly:

"The Presbyterian-affiliated Lewis and Clark College seems to have a similar interest in appearances of autonomy, with a view to avoiding possible legal bars to both federal funds and gifts from some foundations. The change, which legitimizes the college as an autonomous educational institution, removes the requirement that each presbytery in Oregon have at least one representative on the board, but it was made clear 'The college wishes to change *only its legal relationship* to the synod and *not its purposes*,' and promised that it still will elect a minister from each presbytery to the board on nomination of the synod, and will consult the synod before making any change in its statement of purpose, which defines it as a Presbyterian-related college." [14]

The challenged New York law leaves to the Board of Regents, local boards of education, trustees, and other school authorities the supervision of the textbook program.

---

[14] *Id.,* 234 (emphasis in original).

The Board of Regents (together with the Commissioner of Education) has powers of censorship over all textbooks that contain statements seditious in character, or evince disloyalty to the United States or are favorable to any nation with which we are at war. New York Education Law § 704. Those powers can cut a wide swath in many areas of education that involve the ideological element.[15]

In general textbooks are approved for distribution by "boards of education, trustees or such body or officer as perform the functions of such boards . . . ." New York Education Law § 701, subd. 1. These school boards are generally elected, §§ 2013, 2502, subd. 2, though in a few cities they are appointed. § 2553. Where there are trustees, they are elected. §§ 1523, 1602, 1702. And superintendents who advise on textbook selection are appointed by the board of education or the trustees. §§ 1711, 2503, subd. 5, 2507.

The initiative to select and requisition "the books desired" is with the parochial school. Powerful religious-political pressures will therefore be on the state agencies to provide the books that are desired.

These then are the battlegrounds where control of text-book distribution will be won or lost. Now that "secular" textbooks will pour into religious schools, we can rest assured that a contest will be on [16] to provide those books for religious schools which the dominant religious group concludes best reflect the theocentric or other philosophy of the particular church.

---

[15] Cf. *Adler* v. *Board of Education*, 342 U. S. 485; *Barsky* v. *Board of Regents*, 347 U. S. 442.

[16] The proportions of the contest are suggested in the letter dated November 1, 1967, that the late Cardinal Spellman directed to be read at all the masses on Sunday, November 5, 1967, just before the vote on a proposed Constitution that would have opened wide the door to state aid to parochial schools. I have attached the letter as Appendix B to this opinion.

The stakes are now extremely high—just as they were in the school prayer cases (see *Engel* v. *Vitale, supra*)— to obtain approval of what is "proper." For the "proper" books will radiate the "correct" religious view not only in the parochial school but in the public school as well.

Even if I am wrong in that basic premise, we still should not affirm the judgment below. Judge Van Voorhis, dissenting in the New York Court of Appeals, thought that the result of tying parochial school textbooks to public funds would be to put nonsectarian books into religious schools, which in the long view would tend towards state domination of the church. 20 N. Y. 2d, at 123, 228 N. E. 2d, at 798, 281 N. Y. S. 2d, at 810. That would, indeed, be the result if the school boards did not succumb to "sectarian" pressure or control. So, however the case be viewed—whether sectarian groups win control of school boards or do not gain such control— the principle of separation of church and state, inherent in the Establishment Clause of the First Amendment, is violated by what we today approve.

What Madison wrote in his famous Memorial and Remonstrance against Religious Assessments is highly pertinent here: [17]

> "Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment,[18] may force him to conform to any other establishment in all cases whatsoever?"

[17] 2 Writings of James Madison 186 (Hunt ed. 1901).

[18] For a recent account of the extent to which public funds are being poured into sectarian schools see S. Rep. No. 473, 90th Cong., 1st Sess., 9–10 (1967).

## APPENDIX A TO OPINION OF DOUGLAS, J., DISSENTING.

CODE—220–399–2–NYSTL          REQ. NUMBER . . . . . . . .

### TEXTBOOK REQUISITION

PUBLISHERS NAME . . . . . . . . . . . . . . . . . . . . .

STREET ADDRESS . . . . . . . . . . . . . . . . . . . . .

CITY AND STATE . . . . . . . . . . . . . . . . . . . . .

SHIP TO          —EDISON WAREHOUSE

STREET          —VAN GUYSLING AVE.

CITY & STATE—SCHENECTADY, N. Y.

No. COPIES . . . NAME OF BOOK . . . . . . . . . . TOTAL . . .

EDITION . . . . . . . . . . . . . . . . .

GRADE LEVEL . . . . . . . . . . . . . .

PRICE PER BOOK . . . . . . . . . . .                        . . . . . . . . . . . .
                                        Total Amount

I certify that the following number of children residing in your school district have individually requested the loan of the textbook indicated above for the school year 1967–68 in accordance with Section 701, subdivision 2, of the Education Law. Form 1 requests have been submitted to you for each child. I also certify that the textbook requested is a non-sectarian edition and approved for use by a New York State Public School District.

. . . . . . . . . . . . . . . . . . . . . . . . .     . . . . . . . . . . . . . . . . . . . . . . . .
Name of Parochial/Private School          Official of Private School

## APPENDIX B TO OPINION OF
## DOUGLAS, J., DISSENTING.

LETTER OF FRANCIS CARDINAL SPELLMAN,
NOVEMBER 1, 1967.

One of the most precious rights which we have in our civil society is the right to vote. This right should be exercised with reverence and with understanding—particularly when emotional feelings run high.

An important opportunity to exercise this right will be provided on next Tuesday, November 7th. On that day we are asked to choose between the old State Constitution and the proposed new State Constitution. We will decide whether the provisions of the new Constitution will better serve the changing needs of our families, our neighbors, and our institutions, both public and private.

We are faced with a grave responsibility to weigh this choice carefully and to vote conscientiously. I have viewed with concern the tone of the past month's discussion with regard to the proposed new Constitution. I am disappointed that so much of the opposition to the Constitution comes from those forces in our pluralistic society who would deny equal educational opportunities to children attending parochial schools. As a citizen I am dismayed to think that they would have overwhelmingly supported the new Constitution were it not for the fact that it repeals the Blaine Amendment.

The proposed new Constitution, as a whole, is so closely related to our lives that it must command our careful consideration. This document addresses itself to values basic to the fulfillment of our lives as citizens. We must be aware that this Constitution contains new provisions designed to facilitate the rebuilding of our communities, new provisions committing the State to the

maximum development of the educational potential of every citizen, new provisions enabling government, in a responsible way, to mobilize all the forces of society to meet the changing needs of all our people, to enhance their environment and to promote their social well-being.

At the close of the Constitutional Convention I expressed my opinion that the Convention had produced a document worthy of support by the people of New York State. Nothing in the public debate since then has caused me to alter my judgment.

I know that you will conscientiously fulfill your civic duty and that you will give serious consideration to this proposed new Constitution.*

MR. JUSTICE FORTAS, dissenting.

The majority opinion of the Court upholds the New York statute by ignoring a vital aspect of it. Public funds are used to buy, for students in sectarian schools, textbooks which are selected and prescribed by the sec-

---

*One parochial school lobbyist group has urged Congress that in order to avoid an establishment of secularism in education, federal monies must be distributed to all the various sects which operate parochial schools.

"[T]here is no valueless or neutral school," it is argued, and education and religion cannot be separated from each other. Hearings on S. 3 and H. R. 1198 before Subcommittee No. 3 of the House Committee on the Judiciary, 90th Cong., 2d Sess., at —— (1968) (statement of Dr. Francis J. Brown, chairman, National Association for Personal Rights in Education).

The views expressed by my Brother HARLAN in his concurring opinion are somewhat similar. His approval, on a constitutional basis, of government aid to our country's churches "calculated to achieve nonreligious purposes otherwise within the competence of the State" and not involving the state " 'significantly and directly in the realm of the sectarian' " would seem to permit considerable diversion of public funds to the various sects. The state's "competence" in the areas of health, safety, and welfare of the people would under that view permit it to fund a church's charity pro-

tarian schools themselves. As my Brother DOUGLAS points out, despite the transparent camouflage that the books are furnished to students, the reality is that they are selected and their use is prescribed by the sectarian authorities. The child must use the prescribed book. He cannot use a different book prescribed for use in the public schools. The State cannot choose the book to be used. It is true that the public school boards must "approve" the book selected by the sectarian authorities; but this has no real significance. The purpose of these provisions is to hold out promise that the books will be "secular" (but cf. DOUGLAS, J., dissenting, *ante,* at 256, n. 6); but the fact remains that the books are chosen by and for the sectarian schools.

It is misleading to say, as the majority opinion does, that the New York "law merely makes available to all children the benefits of a general program to lend school books free of charge." (*Ante,* at 243.) This is not a "general" program. It is a specific program to use state

---

grams, pay for renovating dilapidated church buildings, and pay for the services and upkeep, such as janitors' salaries and utility bills, necessary to maintain church buildings in safe and healthful condition. Indeed, short of state-provided prayer books, sacramental wine, and the like, churches could, apparently, become virtual state dependencies.

Should that, unhappily, come to pass, then perhaps the church would in time become an administrative arm of the state, a goal predicted by J. Galbraith for "the mature corporation." The New Industrial State 393 (1967).

Then the circle would be completed and we would return to the point where the long struggle to keep church and state separate first started.

Such a constitutional form of government is conceivable. But proposals for putting each of the Nation's religious sects on the public payroll should be addressed to a federal constitutional convention, since, as my Brother BLACK shows, such a scheme was thoroughly rejected in 1791 with the adoption of the First Amendment.

funds to buy books prescribed by sectarian schools which, in New York, are primarily Catholic, Jewish, and Lutheran sponsored schools. It could be called a "general" program only if the school books made available to all children were precisely the same—the books selected for and used in the public schools. But this program is not one in which all children are treated alike, regardless of where they go to school. This program, in its unconstitutional features, is hand-tailored to satisfy the specific needs of sectarian schools. Children attending such schools are given *special* books—books selected by the sectarian authorities. How can this be other than the use of public money to aid those sectarian establishments?

It is also beside the point, in my opinion, to "assume," as the majority opinion does, that "books loaned to students are books that are not unsuitable for use in the public schools because of religious content." (*Ante,* at 245.) The point is that the books furnished to students of sectarian schools are selected by the religious authorities and are prescribed by them.

This case is not within the principle of *Everson* v. *Board of Education,* 330 U. S. 1 (1947). Apart from the differences between textbooks and bus rides, the present statute does not call for extending to children attending sectarian schools the same service or facility extended to children in public schools. This statute calls for furnishing special, separate, and particular books, specially, separately, and particularly chosen by religious sects or their representatives for use in their sectarian schools. This is the infirmity, in my opinion. This is the feature that makes it impossible, in my view, to reach any conclusion other than that this statute is an unconstitutional use of public funds to support an establishment of religion.

This is the feature of the present statute that makes it totally inaccurate to suggest, as the majority does

here, that furnishing these specially selected books for use in sectarian schools is like "public provision of police and fire protection, sewage facilities, and streets and sidewalks." (*Ante,* at 242.) These are furnished to all alike. They are not selected on the basis of specification by a religious sect. And patrons of any one sect do not receive services or facilities different from those accorded members of other religions or agnostics or even atheists.

I would reverse the judgment below.