WILLIAM C. KAHL, State Superintendent, Department of PublicInstruction
In your letter of November 17, 1972, you requested my opinion with respect to legislation regarding the constitutionality of 1971 Assembly Bill 1577. This bill concerns the duties of Boards of Control of Cooperative Educational Service Agencies as provided in sec. 116.03 (3), Wis. Stats. You have indicated orally to a member of my staff that the Legislative Council is presently considering similar legislation and that the question is one of statewide concern. *Page 76 
Boards of Control of a Cooperative Educational Service Agency (CESA) presently are authorized to approve service contracts with school districts, counties and other Cooperative Educational Service Agencies. The legislation proposed would provide that CESA Boards of Control would have the authority to:
"Approve service contracts with school districts, counties, other cooperative educational service agencies, other public educational institutions, private educational institutions, and cities, villages and towns. . . ."
Your specific question is "whether service contracts between CESAs and church-related schools authorized under such legislation would be a contravention of sec. 18 of Art. I of the Wisconsin Constitution and the establishment clause of theFirst Amendment to the United States Constitution."
The answer to your question must be based on the clear understanding of the statutory implementation of the CESAs and the method by which they function.
Section 116.01, Stats., provides:
"116.01 Purpose. The organization of school districts in Wisconsin is such that the legislature recognizes the need for a service unit between the local school district and the state superintendent. The co-operative educational service agencies created under subch. II of ch. 39, 1963, stats., are designed to serve educational needs in all areas of Wisconsin and as a convenience for school districts in co-operatively providing to teachers, students, school boards, administrators and others, special educational services including, without limitation because of enumeration, such programs as research, special student classes, data collection, processing and dissemination, in-service programs and liaison between the state and local school districts."
Under the provisions of subch. II of ch. 39, 1963, Stats., 19 CESA districts encompassing all school districts in the State of Wisconsin were created.
Sections 116.02 and 116.03, Stats., provide that each CESA be governed by a Board of Control consisting of one member from the School Board of each of the school districts comprising the CESA. *Page 77 
The Board of Control among other things must hire an agency coordinator. Section 116.04 provides:
"116.04 Agency co-ordinator. The agency co-ordinator shall be responsible for co-ordinating the services, securing the participation of the individual school districts, county boards and other cooperative educational service agencies and implementing the policies of the board of control."
State aid is furnished to each CESA. In this connection sec.116.08, Stats., provides in part:
"116.08 State aid. (1) Annually, there shall be paid not exceeding $29,000 to each agency for the maintenance and operation of the office of the board of control and agency coordinator. No state aid may be paid unless the agency submits by August 1 an annual report which includes a detailed certified statement of its expenses for the prior year to the state superintendent, and such statement reveals that the state aid was expended as provided by this section. In no case may the state aid exceed the actual expenditures for the prior year as certified in such statement.
". . .
"(4) Whenever an agency performs any service or function under this title by contract with a county board or any agency thereof, with a school board or with a county handicapped children's education board, the contract may authorize the agency to make claim for and receive the state aid for performing the service or function. The agency shall transmit a certified copy of the contract containing the authority to collect state aid to the department. When an agency receives such state aid, it shall pay over or credit the amount of state aid received to the proper county or agency thereof, school district or county handicapped children's education board for which the service or function was performed according to the contract therefor."
CESAs provide two general types of service. The first type involves personnel hired by CESA to perform services contracted for by individual school district members of the individual CESA. The terms of these contracts generally provide that the school district will pay the CESA for the pro rata time used by the CESA *Page 78 
personnel servicing the district. The expenses incurred by some of these programs are partially reimbursed by state aid which is credited to the school district. Some of the programs for which there is reimbursement by state aid are: school social worker, speech therapist, school psychologist and local vocational, educational coordinator.
Some programs for which there is no state reimbursement to the local school district are audio-visual director, television consultant, elementary and secondary directors, nurses, guidance counselors and teachers of science, art, driver education, music and so forth.
The second general type of service rendered may be termed non-personnel service. This includes such programs as data processing and cooperative purchasing. Some CESAs make a flat charge to the school districts to defray some expenses incurred in rendering these services. The costs which are not recovered in this manner are charged to the administration expenses of the individual CESAs. The cost of administering the individual CESAs is funded by state aid pursuant to the provisions of sec. 116.08, Stats.
The effect of the proposed legislation would be to make any type of service being rendered now or to be rendered in the future available without limitation to private schools as well as public schools. The term private schools includes parochial schools.
It is my opinion that such legislation without any limitation as to the type of service or a requirement that the private schools reimburse the CESAs for the entire cost of service would certainly violate the establishment clause of the First Amendment to the United States Constitution and Art. I, sec. 18 of the Wisconsin Constitution. The establishment clause of theFirst Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion . . ."
The Supreme Court having concluded that among those rights included in the Fourteenth Amendment are those encompassed by theFirst Amendment, the establishment clause is therefore a limitation on the sovereign power of the states.
In Lemon v. Kurtzman (1971), 403 U.S. 602, 609, 611,91 S.Ct. 2105, 29 L.ed. 2d 745, 754, the United States Supreme Court had before it a Pennsylvania Statute which authorized the State *Page 79 
Superintendent of Public Instruction "to `purchase' specified `secular educational services' from nonpublic schools. Under contracts authorized by the statute the state directly reimburses nonpublic schools for their actual expenditure. A school seeking reimbursement must maintain prescribed accounting procedures that identify the `separate' cost of secular educational services." The court in its opinion pointed out that in the analysis of a problem in the area of the establishment clause three tests have been developed:
"* * * First the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v.Allen, 392 U.S. 236, 243, 20 L.Ed.2d 1060, 1065, 88 S.Ct 1923
(1968); finally the statute must not foster `an excessive government entanglement with religion.' . . ." Walz v. Tax Commission,397 U.S. 664, 668, 25 L.ed. 2d 697, 701, 90 S.Ct. 1409 (1970), Lemonsupra at 612, 29 L.ed. 2d at 755.
The court concluded that the cumulative impact of the relationship created by the statutes involved excessive entanglement between the government and religion. The court in distinguishing the Pennsylvania statute and the Everson and Allen
cases noted that the Pennsylvania Statute had the defect of providing state aid directly to church-related schools. In theEverson and Allen cases state aid was provided to the student and his parents. Board of Education v. Allen (1968), 392 U.S. 236,243-244, 88 S.Ct. 1923, 20 L.ed. 2d 1060; Everson v. Board ofEducation (1947), 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.ed.2d 711.
Under the proposed legislation without any restriction as to the content of the contract it is quite possible to have an arrangement that would clearly fail all three of the tests developed in Lemon, supra.
It is therefore my opinion that the statute as it now stands clearly authorizes arrangements between parochial and public school agencies which would violate the establishment clause of the United States Constitution.
It is also clear that the legislation violates Art. I, sec. 18
of the Wisconsin Constitution. Sec. 18 provides in part, ". . . nor shall . . . any preference be given by law to any religious establishments *Page 80 
or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." In State ex rel. Reynolds v. Nusbaum
(1961), 17 Wis.2d 148, 165, 115 N.W.2d 535, the court reaffirmed the previous holding of the court that religious or theological seminaries as used in sec. 18 includes primary and secondary schools as they exist today. In addition the court stated ". . . we deem that the First amendment provision, . . . `respecting an establishment of religion,' lends itself to more flexibility of interpretation than the provision contained in the last clause of sec. 18, art. 1 of the Wisconsin constitution." Clearly the legislation would permit expenditure of public funds "for the benefit of religious societies, or religious or theological seminaries."
I do not intend to imply that it is constitutionally impossible to permit by statute the rendering of some service by CESAs to children attending private schools. Any such legislation, however, would have to consider the guidelines in Lemon v.Kurtzman. It would be well to note the limitations of the Wisconsin Constitution as they are defined in the recent case ofState ex rel. Warren v. Reuter (1969), 44 Wis.2d 201, 227,170 N.W.2d 743. There the court wrote that it found nothing inNusbaum inconsistent with the primary effect test. This test first announced in Everson, supra holds that if the primary effect of the legislation is either to hinder or advance religion such legislation violates the establishment clause. In Reuter,supra the court wrote at page 227:
"Granting that art. I, sec. 18 of the Wisconsin Constitution is more prohibitive than the first amendment of the federal constitution, it does not follow and we cannot read sec. 18 as being so prohibitive as not to encompass the primary-effect test. In the case before us, the primary effect of the legislation is not the advancement of religion but the advancement of the health of Wisconsin residents."
Thus legislation which would provide for contracts between CESAs and private as well as public schools which would encompass services "advancing the health" of the school children might possibly negate the constitutional objections raised in the Stateex rel. Reynolds v. Nusbaum and Lemon cases. *Page 81 
Those concerned with drafting legislation in this area would do well to consider the guidelines developed by the Wisconsin Supreme Court in State ex rel. Warren v. Nusbaum (1971), 55 Wis.2d 316. In this case the court held that a state statute granting financial aid to Marquette University Dental School violated both the State and Federal Constitutions. The court noted, however, that more careful drafting of the statute could cure these constitutional infirmaties. Of additional interest are two recent cases, Committee for Public Education and Religious Liberty etal. v. Nyquist, et al. (1972), 350 F. Supp. 655 and Wolman, etal. v. Essex et al. (1972), 342 F. Supp. 399. The Nyquist case was decided by a three-judge panel of the Federal Court of the Eastern District of New York. The court held in this case that income tax credits for parents of certain classes of children attending private schools did not violate the First Amendment of the United States Constitution. On the other hand, in Wolman case a three-judge panel of the Federal District Court in Ohio held that a similar plan did violate the United States Constitution. Consideration of the statutes involved in these cases as well as the reasoning of the respective decisions may be of help in the drafting of legislation in this area.
In any event is is suggested that any legislation of this kind be drawn in a more restrictive manner than the 1971 Assembly Bill 1577. The legislation should also carry a proviso that the Attorney General seek a test as to the validity of the legislation. This procedure seems more desirable in this important legislative field than to request that the Attorney General determine by opinions on each CESA contract with a private school what the holding of the Wisconsin and/or the United States Supreme Court might be with respect to the establishment clause of the United States Constitution and Art.I, sec. 8 of the Wisconsin Constitution.
RWW:JWC