**Alton J. LEMON, Priscilla Reardon, Betty J. Worrell, and Pennsylvania State Education Association, Pennsylvania Conference National Association for the Advancement of Colored People, Pennsylvania Council of Churches, Pennsylvania Jewish Community Relations Conference, Americans United for Separation of Church and State, American Civil Liberties Union of Pennsylvania, Inc.**

v.

**David H. KURTZMAN, as Superintendent of Public Instruction of the Commonwealth of Pennsylvania, Grace Sloan, as State Treasurer of the Commonwealth of Pennsylvania, St. Anthony's Roman Catholic Church School, Archbishop Woods Girls High School, Ukrainian Catholic School, Germantown Lutheran Academy, Akiba Hebrew Academy, Philadelphia Montgomery Christian Academy, and Beth Jacobs Schools of Philadelphia.**

Civ. A. No. 69 1206.

United States District Court
E. D. Pennsylvania.

Nov. 28, 1969.

Probable Jurisdiction Noted
April 20, 1970.

See 90 S.Ct. 1354.

Hastie, Chief Circuit Judge, dissented.

**38**

Henry W. Sawyer, III, Philadelphia, Pa., and Leo Pfeffer, New York City, for Alton J. Lemon, et al.

John D. Killian, Harrisburg, Pa., for Pennsylvania Council of Churches.

William C. Sennett, Atty. Gen., Harrisburg, Pa., for D. H. Kurtzman and G. Sloan.

Wm. B. Ball and Joseph G. Skelly, Harrisburg, Pa., for Archbishop Wood High School for Girls.

James E. Gallagher, Jr., and C. Clark Hodgson, Jr., Philadelphia, Pa., for St. Anthony's Roman Catholic Church School and Ukrainian Catholic School.

Samuel Rappaport, Philadelphia, Pa., for Akiba Hebrew Academy and Beth Jacobs Schools of Philadelphia.

F. Raymond Heuges, Philadelphia, Pa., for Germantown Lutheran Academy.

Donald A. Semisch, Willow Grove, Pa., for Philadelphia Montgomery Christian Academy.

Henry T. Reath, Philadelphia, Pa., for Pennsylvania Assn. of Independent Schools.

Before HASTIE, Chief Circuit Judge, and LUONGO and TROUTMAN, District Judges.

TROUTMAN, District Judge.

## OPINION AND ORDER

The present suit seeks to enjoin the alleged unconstitutional approval and expenditure of State funds under the Pennsylvania Nonpublic Elementary and Secondary Education Act[1] (hereinafter the Education Act). Since the complaint alleges the unconstitutionality of a statute of state-wide application, this three-judge panel has been convened. 28 U.S. C. §§ 2281–2284.[2]

Jurisdiction is based on the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act, 28 U.S.C. § 1343. Presently before the Court are defendants' motions to dismiss for lack of standing and for failure to state a claim upon which relief can be granted.

The individual plaintiffs are citizens and taxpayers of the Commonwealth of Pennsylvania and their claims are brought in that capacity. Plaintiff Lemon, in addition to being a citizen and taxpayer, is a Negro parent of a child attending public school in Pennsylvania. The organizational plaintiffs are associations of persons resident in the Commonwealth of Pennsylvania which "share as a common objective the separation of Church and State and the opposition to the use of public funds for the support in whole or in part of sectarian schools, or other private schools whose policies and practices, by purpose or effect, exclude or otherwise discriminate against persons by reason of race or religion."[3] The National Association for the Advancement of Colored People, (NAACP) with which the plaintiff, Pennsylvania

---

1. Nonpublic Elementary and Secondary Education Act, 24 P.S. § 5601 et seq. (Supp.1969). The complete text of the statute appears in Appendix A, *infra*.

2. See Ex parte Bransford, 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249 (1940).

3. Complaint at p. 2.

State Conference of the NAACP, is affiliated, "is an organization whose purpose is to seek the elimination of racial discrimination through resort to judicial proceedings and otherwise".[4] Each of the organizational plaintiffs asserts its standing to sue as a party-plaintiff in the instant suit.

The defendant Kurtzman is the Pennsylvania Superintendent of Public Instruction who is responsible for approving the allocation of funds under the Pennsylvania Education Act. Defendant Sloan is the State Treasurer of the Commonwealth of Pennsylvania who will allocate the approved funds. The seven defendant schools are sectarian elementary and secondary educational institutions situated within the Eastern District of Pennsylvania, who have contracted with the Commonwealth for the purchase of secular educational services under the Education Act.[5]

## I.

### *The Nonpublic Elementary and Secondary Education Act.*

The Education Act was signed into law by the Governor of Pennsylvania on June 19, 1968. The Act empowers the State Superintendent of Public Instruction to contract for the purchase of "secular educational services" from nonpublic schools located in the Commonwealth of Pennsylvania which fulfill the compulsory school attendance requirements under Pennsylvania law.

In its legislative findings and declaration of policy[6] the Pennsylvania Legislature has determined that a crisis exists in elementary and secondary education in Pennsylvania due to rapid increases in costs and school population and consequent demands for more teachers and facilities. It was also found that twenty per cent of all elementary and secondary school children in Pennsylvania fulfill the requirements of the Commonwealth's compulsory school attendance laws in nonpublic schools. It has been further recognized that elementary and secondary education constitutes a public welfare purpose and that nonpublic education, by providing instruction in secular subjects, contributes significantly to the achievement of this public purpose. The Legislature, therefore, concluded that it is a governmental duty to support the achievement of this public welfare purpose by supporting the purely secular objectives of nonpublic education.

Briefly, the operational scheme of the statute permits the Superintendent of Public Instruction to enter into contracts[7] with nonpublic schools, whether sectarian or nonsectarian, for the purchase of "secular educational services". These "secular educational services" are defined[8] to mean "providing of instruction in a secular subject", while secular subject is defined as "any course which is presented in the curricula of the public schools of the Commonwealth and shall not include any subject matter expressing religious teaching, or the morals or forms of worship

---

4. Complaint at p. 2.

5. The Pennsylvania Association of Independent Schools (PAIS) has been permitted to intervene as a party-defendant for the limited purpose of arguing the defendants' motion to dismiss.

6. 24 P.S. § 5602, Appendix A *infra*.

7. The Pennsylvania Supreme Court has recognized that the State may contract with sectarian institutions for the purchase of needed public services. Schade v. Allegheny County Inst. Dist., 386 Pa. 507, 126 A.2d 911 (1956). Furthermore, Pennsylvania has also recognized that such contracts are not "appropriations" to aid such organizations under the Penn-

*Schade, supra*; see also Commonwealth v. Perkins, 342 Pa. 529, 21 A.2d 45 (1941). Apparently, the reason for adopting a contractual method for carrying forth the aims of the Education Act was to avoid possible conflicts with the strictures of the Pennsylvania Constitution. Regardless of the method employed to distribute funds under the Education Act, the constitutional result we reach today would not be changed. As long as the purpose and primary effect of the statute neither advances nor inhibits religion, the constitutional standard is satisfied.

8. All definitions appear in 24 P.S. § 5603, Appendix A, *infra*.

of any sect". All purchases of secular educational services under the Education Act are to be at the "actual cost" of three items of such service: teacher salaries, textbooks and instructional materials. The Education Act further limits all purchases of secular educational services to courses in mathematics, modern foreign languages, physical science, and physical education[9]. As a condition for payment under the Act, the Superintendent of Public Instruction must approve all textbooks and instructional materials employed in the instruction rendered. In addition, a satisfactory level of student performance in standardized tests must have been attained and within five years of the date of the Act all secular educational services for which reimbursement is sought must be rendered by teachers holding State certification equal to the standard for teachers in public schools.[10]

Payment under the Act in discharge of the contractual obligation may be made only after service has been rendered. Section 5607(a) provides in relevant part that:

Any nonpublic school seeking such reimbursement shall maintain such accounting procedures, including maintenance of separate funds and accounts pertaining to the cost of secular educational service, as to establish that it actually expended in support of such service an amount of money equal to the amount of money sought in reimbursement. Such accounts shall be subject to audit by the Auditor General.

Funds for the operation and administration of the Education Act are to be drawn only from the nonpublic elementary and secondary education fund. The monies comprising this fund are to be taken exclusively from the proceeds of State horse racing and harness racing.[11]

Defendants, in their brief, have informed the Court that 1181 nonpublic elementary and secondary schools in Pennsylvania, having a total pupil population of 535,215 children, and located in 55 of Pennsylvania's 67 counties, are now under contract with the Commonwealth pursuant to the Education Act. One year's performance under contract has now been rendered and, on September 2, 1969, the Commonwealth paid its first quarterly installment obligation.

II

*Standing of the Individual and Organizational Plaintiffs*

The defendants have moved pursuant to Rule 12(b) to dismiss plaintiffs' complaint on the grounds that both the organizational and individual plaintiffs lack standing to maintain the instant suit under the religious clauses of the First Amendment and the equal protection clause of the Fourteenth Amendment.[12]

---

9. The definitions in the "Rules and Regulations for Implementing the Pennsylvania Nonpublic Elementary and Secondary Education Act" provide that "Secular educational service purchased under this Act shall consist solely of courses in the subjects of mathematics, modern foreign languages, physical science, and physical education". Definition 8 at p. 3.

10. See 24 P.S. § 5604, Appendix A, *infra*.

11. Section 5606 of the Act prohibits the use of any monies raised by the Commonwealth for the support of the public schools to pay for services or administrative costs under the Education Act.

In December, 1968, extensive regulations were promulgated by the Superintendent of Public Instruction which further delineate the details and operating procedures of the Act and further elaborate its secular, fiscal, and quality controls.

12. For the purposes of standing, we consider plaintiffs allegations under the Civil Rights Act, 28 U.S.C. § 1343, to be substantial equivalents to the equal protection claims raised. We have made, therefore, no separate analysis of standing under the Civil Rights Act, but rather treat these contentions in our analysis of standing under the equal protection clause.

## A. Organizational Plaintiffs

■ The organizational plaintiffs assert their standing solely on the ground that they are organizations established for the purposes of either maintaining the separation of Church and State or preventing racial discrimination. Nothing further is alleged with respect to the issues of the instant case than the fact that these organizations share a common interest in the outcome of this suit as it may or may not comport with their particular organizational goals. The fundamental aspect of standing, as recently articulated by the Supreme Court, is that "it focuses on the party seeking to get his complaint before a federal court * * *." Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1967). The Flast decision further noted that "the emphasis in standing problems is on whether the party invoking federal court jurisdiction has 'a *personal stake* in the outcome of the controversy' * * * and whether the dispute touches upon *'the legal relations of parties having adverse legal interests.'* * * *" Flast v. Cohen, *supra,* at 101, 88 S.Ct. at 1953. (Emphasis added)

■ On the basis of the allegations set forth in the complaint as they pertain to the organizational plaintiffs, we can perceive no *personal stake* or *adverse legal interests* of these plaintiffs which demonstrate their standing as *parties* to the instant suit. Regardless of the good motives of these organizations, the mere fact that the instant case may result in a decision which may be in accord with or adverse to the respective general purposes of these organizations we believe is insufficient to establish standing to sue as an affected party in interest [13]. Consequently the organizational plaintiffs have failed to establish standing as to both the religious and equal protection issues involved in the instant case.

## B. Individual Plaintiffs

The individual plaintiffs, Alton Lemon, Priscilla Reardon and Betty J. Worrell, assert standing under the religious clauses of the First Amendment and the equal protection clause based upon varied allegations of status as to each issue.

Initially, it is alleged that all individual plaintiffs are taxpayers of the Commonwealth of Pennsylvania. Plaintiff Lemon alleges he has paid an admission fee to a Pennsylvania race track. Such fees provide the sole financing of the Education Act. The other individual plaintiffs have not alleged payment of such admission fees.

■■ As to plaintiff Lemon's standing as a taxpayer under the establishment and free exercise clauses of the First Amendment, again we note that the focus is on the party asserting his claim. In this respect, however, "[i]t is both appropriate and necessary to look to the substantive issues * * * to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." Flast v. Cohen, supra, at 102, 88 S.Ct., at 1953. Although the *Flast* decision concerned itself with the status of a federal taxpayer to challenge a federal spending program under the establishment and free exercise clauses of the First Amendment, we consider that its requirements as to standing apply as well to state taxpayers. *Flast* dictates two requirements for taxpayers standing, namely that: "First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked" 392 U.S. at 102, 88 S.Ct. at 1954 and "Secondly, the taxpayer must establish a nexus between that

13. The organizational plaintiffs have argued that they should be permitted to sue here as private attorneys general. The Court, however, perceives no precedent or persuasive reason to adopt this theory in the instant case. Indeed, to do so may result in the rendering of an advisory opinion on a constitutional matter in contravention of Article III of the Constitution. See Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

status and the precise nature of the constitutional infringement alleged". 392 U.S. at 102, 88 S.Ct. at 1954. In *Flast*, both elements were satisfied since it was alleged that the taxing and spending powers of the federal government were being used in excess of the specific constitutional limitations imposed upon their exercise by the First Amendment. See 392 U.S. at 103, 88 S.Ct. 1942. Since the First Amendment applies to State governmental powers, Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the exercise of State taxing and spending is equally limited. These are precisely the allegations made by plaintiff Lemon in the instant case. We, therefore, hold that he has by these allegations demonstrated standing to challenge the Education Act under the establishment and free exercise clauses of the First Amendment.

■ The other individual plaintiffs assert generally that they are taxpayers in Pennsylvania. However, they have not alleged the payment of any tax which would bring them within the class of affected taxpayers. Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952); Murdock v. Pennsylvania, 319 U.S. 105, 108, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Rather, these plaintiffs allege that they have not paid an admission fee to a Pennsylvania race track because to do so would require them to pay tax for the support of religion in violation of their rights of conscience. The personal right to freedom of conscience is protected by the free exercise clause of the First Amendment and the State may not condition other rights or privileges upon the sacrifice of this freedom. See Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). Although the privilege to attend a race track here asserted and its connection to free exercise is less apparent than in either of the above cited cases, we will recognize it for the purpose of establishing the standing of these plaintiffs.

■ The remaining question is whether any of the individual plaintiffs have standing to challenge the Education Act on equal protection grounds. It is alleged generally in the complaint that the private schools which have contracted or will contract with the Commonwealth under the Education Act intentionally discriminate in the selection of students and/or teachers or are de facto segregated by race or religion. It is further alleged that the funds allocated by the Commonwealth to these schools under the Act will be used to perpetuate and support these practices and as such there is State action involved. We will assume for the purpose of deciding this aspect of the standing issue that these alleged facts could be proved at a hearing on the merits. Nevertheless, these plaintiffs lack standing to challenge the Education Act under the equal protection clause of the Fourteenth Amendment.

The Education Act on its face does not use religion or race as a standard or guideline to determine who may enter into a contract with the Commonwealth. As such the Act itself does not purport to make any classifications to deny equal treatment to members of any particular race or religion. As we previously noted, the requirement of standing focuses on the party affected and his personal stake in the outcome of the litigation at issue. Plaintiff Lemon asserts his status as a Negro and parent of a child in a public school in Pennsylvania. However, there is no allegation in the complaint which asserts that Lemon or his child is personally affected by any alleged intentional discrimination or de facto segregation in these schools. There is no allegation that Lemon's child attempted to enroll at any of these schools and was denied admission because of race or religion. None of the other plaintiffs' allegations point to any interest, parental or otherwise, which has been or may be affected by the alleged discriminatory practices. The absence of an allegation that the personal rights of these parties are affected has the net effect of seeking to raise hypothetical grievances of oth-

ers who *may be* personally injured by such discrimination. Standing requires at least that the plaintiff himself be personally affected. *Flast,* supra, 392 U.S. at 110, 88 S.Ct. 1942. See also United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Race is indeed a relevant consideration to equal protection issues. However, our research does not disclose any case in which a person was permitted to challenge discriminatory practices, policies or laws where he himself was not the object of such practice.[14] Consequently, as none of the individual plaintiffs have alleged a personal stake in the instant case, they have failed to establish standing under the equal protection clause.

## III.

### Establishment and Free Exercise

■■ We consider now the defendants' motions to dismiss the plaintiffs' complaint for failure to state a claim upon which relief can be granted. In this posture of the case we accept as true all well-pleaded allegations of fact in the plaintiffs' complaint. The plaintiffs allege as a fact that the purpose and primary effect of the Education Act is to aid religion. For the purpose of considering the motion to dismiss it is argued that the allegation of the purpose and primary effect of the Education Act in the complaint must be deemed admitted. While it is true that well-pleaded facts in the complaint are deemed admitted for the purpose of testing its sufficiency, such an admission does not include legal conclusions drawn from these facts. Newport News Shipbuilding & Dry Dock Co. v. Schauffler, 303 U.S. 54,

57, 58 S.Ct. 466, 82 L.Ed. 646 (1937); Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252, 253–254 (1960). We believe that the allegation asserts not a fact but a conclusion of law and as such is not admitted for purposes of testing the sufficiency of the complaint. The question of law then presented is whether the purpose or primary effect of the Pennsylvania Education Act on its face or in the necessary effect of its administration is to advance or inhibit religion.[15]

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *." This limitation originally placing a restriction only on federal governmental involvement in religion has since been judicially incorporated into the Fourteenth Amendment and now represents a bar on State as well as Federal action. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The meaning and scope of the First Amendment have been elaborated several times by the decisons of the United States Supreme Court in areas involving education. Most apposite to the instant case are the Supreme Court's decisions in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) and Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). In *Everson,* the Supreme Court held that a New Jersey statute which authorized State reimbursement to parents for bus fares of children attending both public and parochial schools did not violate the establishment clause of the First Amendment. The Court noted that the

14. *See e. g.* Burton v. Wilmington Parking Authority, 365 U.S. 715, 716, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Simkins v. Moses H. Cone Memorial Hosp., 323 F.2d 959 (4th Cir. 1963) cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed. 2d 659 (1964); Deal v. Cincinnati Board of Ed., 369 F.2d 55 (6th Cir.) cert. denied 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed. 2d 114 (1966).

15. More specifically, with respect to the establishment clause, in paragraph 18 of the complaint it is alleged that the Act (1) "has as its purpose the advancement of religion", and (2) "finances and participates in the blending of sectarian and secular education", (3) "provides for direct financial aid out of State funds to sectarian schools", and (4) "has as its primary effect the advancement of religion".

establishment clause prohibits the states from setting up a church or supporting the religious activities of sectarian institutions. 330 U.S. at 16, 67 S.Ct. 504. However, the Court further observed that a State may not hamper citizens from receiving the benefits of public welfare legislation by excluding religions from its benefits. *Id.* The First Amendment "requires the state to be a neutral in its relations with groups of religious believers and non-believers * * *." 330 U.S. at 18, 67 S.Ct. at 513. As bussing was generally in the same category as other government services provided to parochial schools such as ordinary police and fire protection, sewage disposal, public highways and sidewalks, this measure of aid, as it benefited school children, could be constitutionally extended without breaching the standard of government neutrality toward religion embodied in the First Amendment.

Most recently, in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) the Court sustained, over First Amendment objections, legislation in New York which required the State to lend textbooks free of charge to all children in private sectarian and nonsectarian schools. The Court recognized that *"Everson* and later cases have shown that the line between state neutrality to religion and state support of religion is not easy to locate. 'The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, is one of degree'. Zorach v. Clauson, 343 U.S. 306, 314 [72 S.Ct. 679, 684, 96 L.Ed. 954] (1952). See McGowan v. Maryland, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393] (1961)". Id. The Court re-examined its prior decisions and articulated a pragmatic standard, first espoused in Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), by which to test legislation designed to achieve a public objective through religiously affiliated educational institutions. To distinguish between forbidden involvement of the State with religion and those contacts which the Establishment Clause permits the Supreme Court stated:

> The test may be stated as follows: what are the purpose and primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. 374 U.S. at 222, 83 S.Ct. at 1571.

Although the results of the *Everson* and *Allen* decisions were to provide some measure of indirect aid to parochial schools in that transportation to receive religious instruction was facilitated and that the parochial schools' funds were no longer required to purchase certain books, such results did not constitute a breach of State neutrality towards religion. In applying the purpose and primary effect test to the New York statute in *Allen,* the Supreme Court reasoned that "[t]he express purpose of § 701 was stated by the New York Legislature to be furtherance of the educational opportunities available to the young. * * The law merely makes available to all children the benefits of a general program to lend school books free of charge." 392 U.S. at 243, 88 S.Ct. at 1926. Although a distinction between bussing and books was recognized, since the latter may be used as a vehicle of religious teaching, the Court noted that the language of the New York statute neither authorized nor permitted loans or distributions of religious literature. Properly, the Court was not willing to assume that New York's administrators would violate the terms of the statute; accordingly, it was held that the principal of neutrality was satisfied and the primary effect of the statute was not to advance religion. See 392 U.S. at 244, 245, 88 S.Ct. 1923.

 It is here argued that Pennsylvania's Education Act has as its pur-

pose and primary effect the advancement of religion. We believe that the purpose of the Education Act can be found clearly on its face. The Legislature has declared that the purpose of the Education Act is "to promote the welfare of the people of the Commonwealth of Pennsylvania" and "to promote the secular education of children of the Commonwealth of Pennsylvania attending nonpublic schools". Support for this declaration of purpose is found in specific legislative findings which point to the percentage of school-age children educated in Pennsylvania's private institutions, the rising cost of education, increased school population and demands for more qualified teachers and adequate facilities. Furthermore, the Legislature also recognized the potential financial burden on the public treasury and long-range impairment of education which may result if private institutions no longer bear their present educational burdens. The plaintiffs argue that because the vast majority of schools which will contract for the purchase of secular educational services under the Education Act are sectarian schools, the purpose or operative effect of the instant statute must be to support religion. We cannot accept the plaintiffs' argument. "The fact that a state law, passed to satisfy a public need, coincides with the personal desires of the individuals most directly affected is certainly an inadequate reason * * * to say that a legislature has erroneously appraised the public need." Everson v. Board of Education, 330 U.S. at 6, 67 S.Ct. at 507. The purpose of the statute on its face indicates that "[the State's] interest is education, broadly; its method, comprehensive. Individual interests are aided only as the common interest is safeguarded". 392 U.S. at 247, 88 S.Ct. at 1928. The plaintiffs urge that we re-examine the legislative history of the statute and contend that such an examination will disclose that the true intent of the Pennsylvania legislators was to aid religion. We do not, however, feel that it is necessary or appropriate in the instant case to re-examine the legislative history of the Education Act in search of the "true intent" of Pennsylvania's legislators. The legislative findings of the State are not to be lightly set aside. In this connection, Mr. Justice Frankfurter has observed that:

> [T]he private and unformulated influences which may work upon legislation are not open to judicial probing. "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." McCray v. United States, 195 U.S. 27, 56 [24 S.Ct. 769, 776, 49 L.Ed. 78]. "Inquiry into the hidden motives which may move [a legislature] to exercise a power constitutionally conferred upon it is beyond the competency of courts." (Citations omitted) McGowan v. Maryland, 366 U.S. at 469, 81 S.Ct. at 1158.

The education of our nation's children quite properly has been recognized by the Supreme Court as a proper subject of legislation enacted in furtherance of a public interest. Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930). It is neither necessary nor constitutionally permissible to require that educational pursuits be followed only in public institutions of learning; rather, educational goals may effectively be satisfied through private education. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). As a sensible corollary to the *Pierce* decision and considering the State's interest in satisfying its compulsory education laws through private educational institutions, the *Allen* Court observed:

> [I]f the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function. 392 U.S. at 247, 88 S.Ct. at 1928.

We recognize that "private education * * * is playing a significant and valuable role in raising national levels of knowledge, competence, and experience," 392 U.S. at 247, 88 S.Ct. at 1928, and that the public's reliance on private education suggests that adequate *secular* education is being provided in these schools. We further recognize, as did the Supreme Court in *Allen*, that the "State's interest in education would be served sufficiently by reliance *on the secular teachings that accompan[y] religious training*" in nonpublic schools. 392 U.S. at 245, 88 S.Ct. at 1927. Furthermore, we consider that "religious schools pursue two goals, religious instruction and secular education", 392 U.S. at 245, 88 S.Ct. at 1927, and we believe that the State may aid the secular function rather than the sectarian function of private educational institutions in the public interest of education within proper confines and without participating in a forbidden involvement in religion proscribed by the First Amendment. The Education Act on its face authorizes the Commonwealth to contract only for services connected with the *strictly secular* function of educating Pennsylvania's school children in the secular subjects of mathematics [16], physical sciences[17], modern foreign language[18], and physical education[19]. That the Commonwealth must not be involved in the religious functions of sectarian educational institutions is clearly established by the nature and kind of strictly secular subjects selected in the statute itself and the controls and restrictions placed upon the statute's operation by the regulations promulgated thereunder. Thus limited and restricted we cannot hold that the statute advances religion either in purpose or primary effect. Moreover, the statute applies to *all* nonpublic schools both sectarian and nonsectarian. As it may apply to sectarian institutions, we concur with the Supreme Court's statement in *Allen*, supra, that *"we cannot agree * * * either that all teaching in a sectarian school is re-*

16. In the Regulations to the Education Act mathematics is defined as follows:
 12. "Mathematics" shall mean the science of numbers and their operations, interrelations, combinations, generalizations, and abstractions, and of space configurations and their structure, measurement, transformations, and generalizations. It includes the study of number, space, and structural patterns. Branches of mathematics include arithmetic, algebra, geometry, trigonometry, calculus, analysis, probability, statistics, logic, and number theory.

17. Physical Science is defined as
 15. "Physical science" is organized knowledge about the physical composition and structure of phenomena and the process of relating quantitative or qualitative description of physical phenomena related to time, space, mass, or derived concepts in a manner that is in agreement with all observed properties of these phenomena. "Physical science" includes the basic sciences of chemistry, physics, astronomy, geology, physical oceanography, and meteorology as well as the areas of specialization derived from these.

18. Modern foreign languages does not include the teaching of traditional church related classic languages such as Latin or Greek.

 13. "Modern Foreign languages" is a term collectively applied to the study of pronunciation, grammar, composition and reading of foreign languages in contemporary use, as contrasted with that of the ancient, or "dead", languages commonly called the classics.

19. 14. "Physical education" refers to that part of the school program which provides guidance and instruction through physical activities designed to meet the needs of pupils in developing their physical efficiency and recreational skills, and, along with other phases of the curriculum, provides maximum opportunity for growth physically, mentally, emotionally, and socially. It includes adaptive physical education for those pupils who, because of health reasons, are unable to participate in regular classes. "Physical education" does not consist of instruction in music, driver education, military training, or extramural or interscholastic athletics and/or sports. Health instruction is not considered physical education.
 Physical education does ont include sex education or other areas which may be deemed religiously oriented.

*ligious or that the processes of secular and religious training are so intertwined* that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion." (Emphasis added) 392 U.S. at 248, 88 S.Ct. at 1929.

■ Administered within its narrow confines neither the primary nor the necessary operative effect of the statute advances religion. It is quite unlike the situation where State tax-supported public school buildings, facilities and teachers are used as a forum and means for the dissemination of religious doctrines at times and on occasions when pupils are subject to the State's compulsory attendance laws. People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). On the contrary, the statute is limited not only to secular subjects but to a limited number of *specific* secular subjects peculiarly unconnected with and unrelated to the teaching of religious doctrines. The statute is further limited and confined to the purchase of services at cost. Unlike *Schempp* and *Engel* the statute here maintains a position of complete *religious* neutrality. In Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954, the Court approved the State's encouragement of "religious instruction" and its cooperation "with religious authorities" [20]. Here the Education Act does not go so far as to encourage the teaching of religious matter. We recognize that the separation of Church and State embodied in the non-establishment principle is not a self-defining concept. The increasing national concern for education in our society, coupled with the public awareness that private schools are performing a significant public service in educating great numbers of school-age children, necessarily makes the State interested in private education. Of necessity therefore:

> As the State's interest in the individual becomes more comprehensive, its concerns and the concerns of religion perforce overlap. State codes and the dictates of faith touch the same activities. Both aim at human good, and in their respective views of what is good for man they may concur or they may conflict. No constitutional command which leaves religion free can avoid this quality of interplay. McGowan v. Maryland, 366 U.S. 420, 461–462, 81 S.Ct. 1101, 1153, 1154, 6 L.Ed.2d 393 (1966). (Separate opinion of Mr. Justice Frankfurter).

That such a common interest in education exists is desirable if not essential to the continued existence of a free society so long as the State's function is, as here, carefully defined, limited and confined to secular as opposed to sectarian matters. We do not view the First Amendment as requiring an absolute separation between necessarily overlapping interests in the secular education of school-age children. To require such a standard would assume that the State and religion exist in mutually exclusive and sharply defined spheres having no common natural interest in the education of our youth. Such a view would not comport with the extension of even police or fire protection or other governmental services in the public interest.

■ Nor do we find persuasive the argument that the child must be the direct beneficiary of government funds which support secular education. Such an approach would place form over substance in that a constitutional result would depend upon minute distinctions

---

20. The Court in *Zorach* stated:
 When the state encourages religious intruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. * * * 343 U.S. at 313, 72 S.Ct. at 684.

and technicalities. The child and society generally certainly benefit from the improvement of the secular education the child receives regardless of whether there is a direct payment or loan to him or to his parents or to his school or teachers. In our view the constitutional result should not and cannot wholly depend upon the identity of the payee. The use to which the funds are put must be the primary concern.[21]

The mandate of the First Amendment is neutrality with respect to religious teachings, beliefs and practices. The Education Act does not employ religion as its standard. The prerequisites to receiving government funds for the purchase of secular educational services, we believe, are designed to maintain the neutrality required by the First Amendment. While it may be argued that the consequential result of the instant statute may be to indirectly benefit nonpublic sectarian schools, the purpose and primary effect of the Education Act is secular in nature and such an incidental benefit is not sufficient to infringe upon the non-establishment principle of the First Amendment. As was noted by Mr. Justice Harlan, concurring in Board of Education v. Allen, supra:

> [W]here the contested governmental activity is calculated to achieve non-religious purposes otherwise within the competence of the State, and where the activity does not involve the State 'so significantly and directly in the realm of the sectarian as to give rise to * * *, divisive influences and inhibitions of freedom' * * * it is not forbidden by the religious clauses of the First Amendment. 392 U.S. at 249, 88 S.Ct. at 1929.

Admittedly, the line is not an easy one to draw. However, we believe the Education Act is consistent with neutrality towards religion and comes within the permissible limits and spirit of the non-establishment principle. Consequently, we will dismiss the plaintiffs' complaint under the establishment clause.

Plaintiffs also allege in their complaint that the Education Act on its face and in its necessary operative effect denies them the free exercise of religion. With respect to each of the plaintiffs, it is alleged that "[i]t is against the religious conscience of each of the plaintiffs to be forced by operation of the taxing power into contributing to the propagation of religion or for the support of sectarian schools". It is also alleged that the Act "constitutes compulsory taxation for the support of religion or religious educational institutions."

 With respect to the latter allegation, as we have decided that the Education Act in purpose and primary effect does not advance or support religion, such taxation, assuming arguendo that it is compulsory, is not for the support of religion. Consequently, this allegation must fall. With respect to the former allegation, it is the purpose of the free exercise clause of the First Amendment "to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority". School District of Abington Township v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963). There is no allegation in the plaintiffs' complaint as to what their particular religious beliefs are nor how the Education Act, by authorizing the purchase of secular educational services, coerces them in the practice of their religion. In dismissing the free-exercise allegation in Board of Education v. Allen, supra, the Supreme Court stated:

> Appellants also contend that § 701 offends the Free Exercise Clause of the First Amendment. However, 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against

---

21. The Supreme Court in *Allen* implicitly recognized this when it noted the secular books on loan under New York's statute were ordered and stored by the parochial schools but were furnished for the *use* of *individual students*. As such this secular use was in conformity with the Constitution. 392 U.S. at 244 n. 6, 88 S.Ct. 1923.

him in the practice of his religion,' Abington School District v. Schempp, 374 U.S. 203, 233 [83 S.Ct. 1560, 1572, 10 L.Ed.2d 844] * * * and appellants have not contended that the New York law in any way coerces them as individuals in the practice of their religion. 392 U.S. at 248, 88 S.Ct. at 1929.

Since these essential allegations are also lacking in this case plaintiffs have failed to state a claim under the free-exercise clause of the First Amendment and, therefore, their complaint will be dismissed. In view of our disposition of defendants' motions to dismiss, we need not consider the remaining motions.

## ORDER

And now, this 28th day of November, 1969, it is ordered that:

1. Defendants' motion to dismiss the complaint as to the organizational plaintiffs for lack of standing on all issues raised herein is granted.

2. Defendants' motion to dismiss the complaint as to plaintiff Lemon for lack of standing under the religious clauses of the First Amendment is denied.

3. Defendants' motion to dismiss the complaint as to the remaining individual plaintiffs, Priscilla Reardon and Betty J. Worrell, for lack of standing as taxpayers under the establishment clause is granted.

4. Defendants' motion to dismiss the complaint as to individual plaintiffs Reardon and Worrell for lack of standing under the free-exercise clause is denied.

5. Defendants' motion to dismiss the complaint as to all individual plaintiffs for lack of standing under the equal protection clause is granted.

6. Defendants' motion to dismiss the complaint for failure of all plaintiffs to state a claim upon which relief can be granted is granted.

HASTIE, Chief Circuit Judge (dissenting).

The basic question we have to decide is whether the Pennsylvania Nonpublic Elementary and Secondary Education Act, No. 109 of June 19, 1968, 24 P.S. § 5601 et seq., on its face and construed in the light of certain factual allegations of the present complaint which must be deemed correct on motion to dismiss the complaint, violates the Establishment Clause of the First Amendment, as made applicable to the states by the Fourteenth Amendment.

The Act provides that the state shall pay public funds to applying "nonpublic" elementary and secondary schools to reimburse them for having rendered "secular educational service" through the teaching of certain subjects; namely, mathematics, modern foreign languages, physical science and physical education. Reimbursement to a school is authorized only for the cost of teachers' salaries, textbooks and instructional materials after and to the extent that such costs have actually been incurred by the institution.

The complaint alleges that the great majority of the schools eligible for subsidies under the Act are affiliated with or under the control or direction of churches or are in other respects sectarian schools or schools which teach religion and that the primary purpose as well as the principal effect of the Act is thus to aid religious institutions. For purposes of the present motion the majority opinion properly accepts as factually correct the complaint's allegations as to the religious and sectarian character of most of the schools intended to receive and actually receiving state grants-in-aid under the Act. However, that opinion characterizes as an allegation of law, and therefore refuses to accept as correct, the allegation that the primary purpose and principal effect of the Act is thus to aid institutions of religion. Instead, the majority seems to view the question of the purpose and effect of the statute as foreclosed by declarations in the statute itself that the legislative purpose is "to promote the welfare of the people of the Commonwealth" and "to promote the secular education of children of the Commonwealth of Penn-

sylvania attending nonpublic schools". With this I cannot agree.[1] But even if inquiry as to purpose and effect should be confined to examination of the language and scheme of the statute, I cannot avoid the conclusion that the primary purpose and effect of the enactment is to help the nonpublic schools by supplying them with needed financial aid, while whatever promotion of the public welfare is anticipated as a result of such public assistance is at best an incidental consequence claimed in justification of the state's action.

It merits mention at this point that both the statutory text and the majority opinion make much of the concept that the state "contracts to purchase secular educational services". Actually, this phrase is not descriptive of the statutory scheme. A nonpublic school that desires financial aid under the Act need do no more than submit, on a form prescribed by the state, an application designating the portions of its curriculum for which it wants assistance. The State Superintendent of Education then agrees that the state will do what the statute requires, namely, pay the school such sums as Act No. 109 entitles it to receive. This is the so-called "contract". The school need not undertake to enlarge its curriculum or to increase its enrollment. Indeed, it can decrease its enrollment and diminish its curriculum and still qualify for state subsidy. It merely goes through a prescribed procedure in asking for aid and later proving that it has made expenditures that are reimbursable under the Act, without ever obligating itself to do anything for or in the interest of the state. The state buys no services and the school sells none. The artificial characterization of this procedure as "contracting for secular educational services" does not help solve our constitutional problem.

Certainly the Establishment Clause of the First Amendment does not preclude the state from providing any assistance, no matter how indirect, to religious institutions. As the majority opinion correctly indicates, religion's interest and the state's interest in the public good necessarily overlap. In contemporary experience churches and other religious institutions characteristically, and to their great credit, conceive their mission and undertake their ministry through various social means additional to the fundament of worship. The providing of shelter and care for the needy and aged, education for youth, and other social services for the community are all deemed an important part of organized church work. Yet, in the modern welfare state, similar activities have long since won recognition as important governmental functions and responsibilities, from the performance and discharge of which religious institutions with like undertakings may derive incidental benefits. Thus, where the state has supplied all school children with transportation and books, sectarian educational enterprises are indirectly aided by being relieved of a financial burden which they might otherwise feel obligated to bear. In Everson v. Board of Education, 1947, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, and Board of Education v. Allen, 1968, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060, the Supreme Court recognized that the Constitution does not preclude a state from thus providing public services directly to its people merely because such services incidently aid religious institutions. However, these cases do not suggest that the Constitution permits direct public financing of a religious enterprise merely because such aid also benefits the state.

It is unrealistic to view the present statute as merely subsidizing secular instruction and thus only incidentally benefiting religious institutions by releasing their funds for religious purposes. The primary purpose for which

1. This is not a disposition on summary judgment where the factual posture of the case is established by affidavits and exhibits. Here decision is controlled by the allegations of the complaint and our judgment as to the potentiality of proof thereunder.

sectarian schools formulate and offer a comprehensive curriculum apart from the public school system is religious. Through a total educational program offered in a separate religious environment, sectarian schools serve to inculcate and reinforce in children doctrine and moral precepts derived from the tenets of the church. It is not necessary to inquire whether, for the fulfillment of this primary religious purpose every course is taught with religious overtones. The crucial consideration is that the total teaching program is offered in a separate religious environment and for the better achievement of appropriate religious objectives. When the state reimburses a sectarian school for any part of the curricular costs of such a teaching program it directly finances and supports a religious enterprise. Constitutionally, such subsidizing of a religious enterprise is not essentially different from a payment of public funds into the treasury of a church. Such a prohibited involvement of the state in a religious undertaking is not validated merely because the religious enterprise itself incidentally relieves the state of the cost of educating many children.

Even more important than the foregoing analytical distinction are the constitutionally significant consequential distinctions betwen the present statute and those considered in the *Everson* and *Allen* cases. The statute in this case, much more than those in *Everson* and *Allen*, invites religious groups and organizations to act politically and involves the state intrusively in the affairs of religious institutions.

It has already been pointed out that sectarian schools are only part of the complex of activities, many of them as "secular" as the teaching of languages and physical science, which modern churches and religious institutions finance and conduct. Charities, hospitals, community centers and homes for the aged and infirm are familiar examples. The theory that would validate Act No. 109 also unavoidably validates state subsidies for all such enterprises of religious organizations, as well as subsidies for all of the "secular" parts of sectarian education not included in the present statute. If the constitutional bar to state grants in all such cases should be removed, it is reasonable to anticipate continuing political controversy in every state and local community whether and to what extent public funds are to be granted to subsidize a large number and a broad range of activities of religious organizations. Leaders and devout members of various organized religious groups will see it as their duty to their church or sect to seek such aid and to insist that state and local government contribute liberally to their sectarian enterprises. Legislators, government executives and candidates for elective office in whose judgment other claims upon the public purse merit higher priority can anticipate political opposition as enemies of the faith. In this way religion and politics will become *in pari materia*.

So far we have escaped much of the divisiveness and antagonism of political differences and controversies about religious matters because public financing of activities of religious organizations has been understood to be prohibited by our Constitution. Professor Paul Freund has perceptively pointed out that President Kennedy was able to avoid taking a political position upon issues of religious character by relying upon authoritative decisions on the constitutional separation of state and religion as controlling. Freund, Public Aid to Parochial Schools, 1969, 82 Harv.L.Rev. 1680, 1692. But if the present statute is held to be constitutional, I see no escape from the evils that attend a widespread and pervasive intermingling of politics and religion.

The other side of the coin is the inevitability of state intrusion into the affairs of organized religion in the administration of the present statute. As already stated, it is the justifying imperative of most, if not all, church-sponsored and controlled education that formal education shall serve to inculcate

and reinforce in youthful minds sectarian doctrine and moral precepts derived from the tenets of the church.[2] In schools with such a mission it is appropriate, practically unavoidable, that admission policies and practices reflect a preference for enrollment of children of the sponsoring faith, though not necessarily excluding all others. Yet, once the state joins in financing such education, the mandated equalitarian position of the state must result in state imposition of strictly non-discriminatory admission standards consistent with public duty,[3] whatever sacrifice of appropriate religious objectives may result. I cannot square such state intrusion into religious affairs with the concept of separation of church and state which the First Amendment implements.

The same is true in the matter of curriculum. If the state is to finance "secular" teaching in parochial and other church-related schools, the state must have the power and responsibility of monitoring curriculum and instruction to assure that teaching in these state-supported areas is not so oriented as to inculcate sectarian or religious tenets or doctrines. Indeed, Act No. 109 expressly provides for state approval of text books and teaching materials in all subsidized schools. The substantiality of this involvement is indicated by Mr. Justice Douglas in the course of his dissent in Board of Education v. Allen, 392 U.S. 236, 258–262, 88 S.Ct. 1923, 20 L.Ed.2d 1060, where he elaborates numbers of instructive examples of sectarian orientation in teaching materials appropriately used in the teaching of "secular" subjects in church-related schools. The extent to which religious orientation of secular subjects will become an appropriate subject of state inquiry is also suggested by interrogatories which the plaintiffs in this suit have addressed to the defendant schools. For example, the church-related schools have been asked to disclose the extent to which sectarian precepts are involved in the teaching of secular subjects; whether teachers of such subjects are clerics, and what religious materials and symbols are used or displayed in the schools in connection with activities other than religious ceremonies. It is difficult to imagine a type of intrusion by the state more offensive to a religious community than such pervasive monitoring and investigation of instruction and academic organization in order to purge the secular areas of the curriculum of religious orientation. Yet, it is to just such intrusion that the Pennsylvania statute opens the door, if by necessary implication it does not go farther and mandate the entry of state overseers as the only means by which the state can adequately check upon the initial and continuing eligibility of particular "secular" instruction for state financing.[4]

Mr. Justice Goldberg, in School District of Abington Township v. Schempp, 1963, 374 U.S. 203, 307, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 and Mr. Jus-

---

2. See L. Pfeffer, Church, State, and Freedom, 1953, 290–300. See also Rev. S. Woywood, The New Canon Law, under imprimatur of Most Rev. Francis Spellman, Archbishop of New York, and others (1940), quoted in Everson v. Board of Education, 330 U.S. 1, 18, 22–23, 67 S.Ct. 504, 91 L.Ed. 711 (Jackson, J., dissenting).

3. Cf. Evans v. Newton, 1966, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373; Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed. 2d 45; Cooper v. Aaron, 1958, 358 U.S. 1, 16–19, 78 S.Ct. 1401, 3 L.Ed.2d 5; Pennsylvania v. Board of Directors of City Trusts, 1957, 353 U.S. 230, 77 S.Ct.

806, 1 L.Ed.2d 792; Kerr v. Enoch Pratt Free Library, 4th Cir. 1945, 149 F.2d 212.

It is difficult to see how the provision of the Pennsylvania Fair Educational Opportunities Act that sanctions religious discrimination in admission policies and practices of sectarian schools, 24 P.S. § 5004(c), could validly be applied to sectarian schools that receive public financing under Act No. 109.

4. Act No. 109 explicitly restricts state aid to courses which "shall not include any subject matter expressing religious teaching, or the morals or forms of worship of any sect."

tice Harlan, in Board of Education v. Allen, 392 U.S. 236, 249, 88 S.Ct. 1923, 20 L.Ed.2d 1060, have both expressed what I believe to be a sound rationalization that the First Amendment is violated by state action which will "involve the state so significantly and directly in the realm of the sectarian as to give rise to those very divisive influences and inhibitions of freedom which both religion clauses of the First Amendment preclude." I am unable to avoid the conclusion that the state undertaking authorized by Act No. 109 would thus intolerably involve the state in the realm of the sectarian.

It must also be considered that some of the schools eligible for aid under Act No. 109 appear to be nonsectarian private schools which do not include religious training in their educational programs. Obviously, the First Amendment does not debar state aid to such schools. However, the plaintiffs allege and seek to prove statistically that only a very small minority of the eligible schools are of this character and that this fact and the legislative history of the statute combine to show that the primary purpose and effect of the legislation is to aid sectarian schools. I think the plaintiffs should be permitted to show, if they can, that the inclusion of nonsectarian private schools as institutions eligible for state aid is so minor and incidental an aspect of the statutory scheme that it cannot validate the enactment.

It remains to consider the claim that subsidizing the defendant nonpublic schools as authorized by the statute would deny the plaintiffs the equal protection of the laws. I agree with the majority that the organizational plaintiffs lack standing to challenge the legislative scheme under either the First Amendment or the Equal Protection Clause. I also agree that no individual plaintiff alleges that any discrimination practiced by any of the defendant schools affects him or his children in a way that would give him standing to litigate the equal protection issue.

Finally, while I agree with the majority that plaintiff Lemon does and the other individual plaintiffs do not have standing to litigate the alleged violation of the Establishment Clause on the basis of the requirements enunciated by the Supreme Court in Flast v. Cohen, 1967, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947, my reasoning is somewhat different and leads to the conclusion that, except for Lemon, the individual plaintiffs lack standing under the Free Exercise Clause even more clearly than under the Establishment Clause.

In Flast v. Cohen, federal income taxpayers alleged that the expenditure of federal funds under the Elementary and Secondary Education Act of 1965 to finance instruction in sectarian schools and to purchase educational materials for use in such schools violated the religion clauses of the First Amendment. The taxpayers' bill for a declaratory judgment and an injunction was dismissed by a three-judge district court for lack of standing. The Supreme Court reversed, holding that the plaintiffs had satisfied the requirements of a logical connection between their status as taxpayers and both "the type of legislative enactment attacked" and "the precise nature of the constitutional infringement alleged". 392 U.S. at 102, 88 S.Ct. at 1954. The Supreme Court relied principally on its finding that the Establishment Clause was designed to limit the taxing and spending powers of Congress and specifically declined to decide whether the taxpayers' free exercise claim alone would confer standing. 392 U.S. at 104 n. 25, 88 S.Ct. 1942.

In this case, the ultimate source of funds for the challenged payments under Act No. 109, and the only source, is the admission tax on harness races, 15 P.S. § 2606 (1967), and on thoroughbred races, 15 P.S. § 2656 (Supp. 1969). Plaintiff Lemon alleges that he has paid an admission fee to a harness race, including the tax. All three individual plaintiffs allege that "[i]t is against [their] religious conscience to be forced by operation of the taxing power into

contributing to the propagation of religion or for the support of sectarian schools". The majority opinion apparently construes the latter allegation to mean that, except for Lemon, the individual plaintiffs have refrained from attending the races because to do so would require them to support parochial education. However, the complaint contains no factual allegation that these plaintiffs desire to go to the races and have been deterred by reason of the known application of the racing revenues to the purposes of Act No. 109, and none of the individual plaintiffs has alleged any particular religious belief or any effect of Act No. 109 on the practice of a particular religion.

The individual plaintiffs other than Lemon can only be considered "taxpayers" within the scope of the standing requirements of Flast v. Cohen, if their "tax money is being extracted and spent in violation of specific constitutional protections * * *." 392 U.S. at 106, 88 S.Ct. at 1955. The plaintiffs who have not attended horse races have not alleged that their "tax money is being extracted" by Act No. 109 unless by virtue of a theoretical increase in general tax requirements that might result from the failure to allocate racing revenues to general expenses. However, Flast v. Cohen pointed out that where a challenged tax operates "upon a particular class of taxpayers * * * the proper party emphasis in the federal standing doctrine would require that standing be limited to the taxpayers within the affected class." 392 U.S. at 104 n. 25, 88 S.Ct. at 1955. Although the Supreme Court was referring to taxpayer standing under the Free Exercise Clause in the quoted dictum, the required nexus between taxpayer status and "the type of legislative enactment attacked", 392 U.S. at 102, 88 S.Ct. at 1954, also depends on actual or threatened liability for a tax in a challenge under the Establishment Clause. In order to have "the requisite personal stake in the outcome", 392 U.S. at 101, 88 S.Ct. at 1953, the plaintiffs should have an established monetary interest in the relief sought, rather than an interest that will be realized only if judicial action enjoining expenditures supported by a particular tax program to which plaintiffs are not subject shall result in a decrease in general tax burdens. Therefore, the individual plaintiffs other than Lemon do not have taxpayer standing to challenge Act No. 109 under either of the religious clauses because they do not contribute revenues disbursed under the Act, and are not "taxpayers within the affected class."

On the other hand, such a taxpayer as plaintiff Lemon, who is subject to the tax program that supports the particular statutory scheme sought to be enjoined, "may or may not have the requisite personal stake in the outcome * * *." 392 U.S. at 101, 88 S.Ct. at 1953. Focusing upon the nexus between Lemon's status as a taxpayer and "the precise nature of the constitutional infringement alleged", 392 U.S. at 102, 88 S.Ct. at 1954, Lemon does complain that he has been required to contribute in support of an establishment. Although Lemon was not compelled to attend a harness race, he has been constrained by the state government to pay a tax on his attendance, a tax that is specifically earmarked by statute for purposes that allegedly support an establishment of religion. In view of the primary function of the Establishment Clause in restraining taxation and disbursement in support of religion, the tax Lemon has paid possesses a sufficient connection to the challenged expenditures under Act No. 109 and to the alleged constitutional infirmity of the Act to lend the requisite specificity and adverseness to his claim. Accordingly, I conclude that plaintiff Lemon has standing to attack the validity of the legislation under the Establishment Clause.

As to all plaintiffs I would dismiss so much of the claim as alleges a violation of the Equal Protection Clause because of lack of standing to sue. However, in my view, the allegations of the complaint disclose a legislative scheme violative of the Establishment Clause of the First

Amendment, as to which plaintiff Lemon alone shows standing to complain. As to Lemon's First Amendment claim, the motion to dismiss should be denied.

## APPENDIX A

### § 5601. Short title

This act shall be known and may be cited as the "Nonpublic Elementary and Secondary Education Act."

1968, June 19, P.L. ——, No. 109, § 1.

**Title of Act:**

An Act to promote the welfare of the people of the Commonwealth of Pennsylvania; to promote the secular education of children of the Commonwealth of Pennsylvania attending nonpublic schools; creating a Nonpublic Elementary and Secondary Education Fund to finance the purchase of secular educational services from nonpublic schools located within the Commonwealth of Pennsylvania for the benefit of residents of the Commonwealth of Pennsylvania; authorizing the Superintendent of Public Instruction to enter into contracts to carry out the intent and purposes of this act, and to establish such rules and regulations as are necessary; providing for the payment of administrative costs incident to the operation of the act; providing procedures for reimbursement in payment for the rendering of secular educational service; and designating a portion of revenues of the State Harness Racing Fund and of the State Horse Racing Fund as the sources of funds. 1968, June 19, P.L. ——, No. 109.

### § 5602. Legislative finding; declaration of policy

It is hereby determined and declared as a matter of legislative finding—

(1) That a crisis in elementary and secondary education exists in the Nation and in the Commonwealth involving (i) the new recognition of our intellectual and cultural resources as prime national assets and of the national imperative now to spur the maximum educational development of every young American's capacity; (ii) rapidly increasing costs occasioned by the rise in school population, consequent demands for more teachers and facilities, new but costly demands, in the endeavor for excellence, upon education generally; the general impact of inflation upon the economy; and the struggle of the Commonwealth, commonly with many other states, to find sources by which to finance education, while also attempting to bear the mounting financial burden of the many other areas of modern State governmental responsibility;

(2) That nonpublic education in the Commonwealth today, as during past recent decades, bears the burden of educating more than twenty percent of all elementary and secondary school pupils in Pennsylvania; that the requirements of the compulsory school attendance laws of the Commonwealth are fulfilled through nonpublic education;

(3) That the elementary and secondary education of children is today recognized as a public welfare purpose; that nonpublic education, through providing instruction in secular subjects, makes an important contribution to the achieving of such public welfare purpose; that the governmental duty to support the achieving of public welfare purposes in education may be in part fulfilled through government's support of those purely secular educational objectives achieved through nonpublic education;

(4) That freedom to choose nonpublic education, meeting reasonable State standards, for a child is a fundamental parental liberty and a basic right;

(5) That the Commonwealth has the right and freedom, in the fulfillment of its duties, to enter into contracts for the purchase of needed services with persons or institutions whether public or nonpublic, sectarian or nonsectarian;

(6) That, should a majority of parents of the present nonpublic school population desire to remove their children to the public schools of the

Commonwealth, an intolerable added financial burden to the public would result, as well as school stoppages and long term derangement and impairment of education in Pennsylvania; that such hazard to the education of children may be substantially reduced and all education in the Commonwealth improved through the purchase herein provided of secular educational services from Pennsylvania nonpublic schools.
1968, June 19, P.L. ——, No. 109, § 2.

### § 5603. Definitions

The following terms whenever used or referred to in this act shall have the following meanings, except in those instances where the context clearly indicates otherwise:

(1) "Nonpublic Elementary and Secondary Education Fund" shall mean the fund created by this act.

(2) "Secular educational service" shall mean the providing of instruction in a secular subject.

(3) "Secular subject" shall mean any course which is presented in the curricula of the public schools of the Commonwealth and shall not include any subject matter expressing religious teaching, or the morals or forms of worship of any sect.

(4) "Nonpublic school" shall mean any school, other than a public school within the Commonwealth of Pennsylvania, wherein a resident of the Commonwealth may legally fulfill the compulsory school attendance requirements of law.

(5) "Purchase secular educational service" shall mean the purchase by the Superintendent of Public Instruction from a nonpublic school, pursuant to contract, of secular educational service at the reasonable cost thereof.

(6) "Reasonable cost" shall mean the actual cost to a nonpublic school of providing a secular educational service and shall be deemed to include solely the cost pertaining thereto of teachers' salaries, textbooks and instructional materials.
1968, June 19, P.L. ——, No. 109, § 3.

### § 5604. Nonpublic Elementary and Secondary Education Fund

There is hereby created for the special purpose of this act a Nonpublic Elementary and Secondary Education Fund dedicated to the particular use of purchasing secular educational service consisting of courses solely in the following subjects: mathematics, modern foreign languages, physical science, and physical education, provided, however, that as a condition for payment by the Superintendent of Public Instruction for secular educational service rendered hereunder, the Superintendent of Public Instruction shall establish that (i) solely textbooks and other instructional materials approved by the Superintendent of Public Instruction shall have been employed in the instruction rendered; (ii) a satisfactory level of pupil performance in standardized tests approved by the Superintendent of Public Instruction, shall have been attained; (iii) after five years following the effective date of this act, the secular educational service for which reimbursement is sought was rendered by teachers holding certification approved by the Department of Public Instruction as equal to the standards of this Commonwealth for teachers in the public schools: Provided, however, That any such service rendered by a teacher who, at the effective date of this act, was a full time teacher in a nonpublic school, shall be deemed to meet this condition.
1968, June 19, P.L. ——, No. 109, § 4.

### § 5605. Administration

The administration of this act shall be under the direction of the Superintendent of Public Instruction, who shall establish rules and regulations pertaining thereto, make contracts of every name and number, and execute all instruments necessary or convenient for the purchase of

secular educational service hereunder. All expenses incurred in connection with the administration of this act shall be paid solely out of the Nonpublic Elementary and Secondary Education Fund and no money raised for the support of the public schools of the Commonwealth shall be used in connection with the administration of this act.

1968, June 19, P.L. ——, No. 109, § 5.

### § 5606. Moneys for fund

(a) Permanent Moneys. Into the Nonpublic Elementary and Secondary Education Fund shall be paid each year:

(1) All proceeds from horse racing up to the first ten million dollars ($10,000,000) realized by the State Horse Racing Fund established by the act of December 11, 1967 (Act No. 331),[1] remaining after, and not required for, payment of all of the items of administrative cost set forth in subsection (b) of section 18 of that act,[2] plus

(2) One-half of all such horse racing proceeds in excess of the sum of ten million dollars ($10,000,000), the remaining half thereof to be paid into the General Fund.

(b) Temporary Moneys. Until the time that proceeds in the amount of ten million dollars ($10,000,000) shall, in a given fiscal year, have been paid into the Nonpublic Elementary and Secondary Education Fund as provided for under subsection (a) of section 6 hereof,[3] three-fourths of the proceeds from harness racing realized by the State Harness Racing Fund established by the act of December 22, 1959 (P.L. 1978), as amended,[4] remaining after and not required for, the payments provided for in subsections (b) and (d) of section 16 of that act,[5] shall be paid into the Nonpublic Elementary and Secondary Education Fund according to the following formula:

(1) The entire three-fourths of the harness racing proceeds for any fiscal year shall be paid into the Nonpublic Elementary and Secondary Education Fund until such year as the horse racing proceeds designated by this section for the said fund are of such amount that, combined with the harness racing proceeds, the sum of ten million dollars ($10,000,000) shall have been realized by the Nonpublic Elementary and Secondary Education Fund.

(2) Proceeds from harness racing shall cease to be paid into the Nonpublic Elementary and Secondary Education Fund for any fiscal year in which proceeds from horse racing, designated by this section for the Nonpublic Elementary and Secondary Education Fund, shall equal ten million dollars ($10,000,000).

Moneys in the Nonpublic Elementary and Secondary Education Fund are hereby appropriated to the Department of Public Instruction to be used by the Superintendent of Public Instruction solely for the purchase of secular educational service hereunder and administrative expenses pertaining thereto as provided for in section 5 of this act.[6]

1968, June 19, P.L. ——, No. 109, § 6.

[1] 15 P.S. § 2651 et seq.
[2] 15 P.S. § 2668.
[3] This section.
[4] 15 P.S. § 2601 et seq.
[5] 15 P.S. § 2616.
[6] Section 5605 of this title.

### § 5607. Reimbursement procedures

(a) Requests for reimbursement in payment for the purchase of secular educational service hereunder shall be made on such forms and under such conditions as the Superintendent of Public Instruction shall prescribe. Any nonpublic school seeking such reimbursement shall maintain such accounting procedures, including maintenance of separate funds and accounts pertaining to the cost of secular educational service, as to establish that it actually expended in support of such service an amount of money equal to the amount of money sought in reimbursement. Such

accounts shall be subject to audit by the Auditor General. Reimbursement payments shall be made by the Superintendent of Public Instruction in four equal installments payable on the first day of September, December, March and June of the school term following the school term in which the secular educational service was rendered.

(b) Reimbursements for any fiscal year for the purchase of secular educational service hereunder shall not exceed the total amount of the moneys which were actually paid into the Nonpublic Elementary and Secondary Education Fund in that fiscal year.

(c) In the event that, in any fiscal year, the total amount of moneys which were actually paid into the Nonpublic Elementary and Secondary Education Fund shall be insufficient to pay the total amount of validated requests hereunder in reimbursement for that year, reimbursements shall be made in that proportion which the total amount of such requests bears to the total amount of moneys in the Nonpublic Elementary and Secondary Education Fund.

(d) The Budget Secretary shall, by July fifteenth of each year, certify to the Superintendent of Public Instruction, the total amount of money in the Nonpublic Elementary and Secondary Education Fund.

1968, June 19, P.L. ——, No. 109, § 7.

### § 5608. Effective date

This act shall take effect July 1, 1968.

1968, June 19, P.L. ——, No. 109, § 8.

### § 5609. Severability

If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or [1] more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

1968, June 19, P.L. ——, No. 109, § 9.

[1] Enrolled bill reads "of".