

# THE ATTORNEY GENERAL

# OF TEXAS

**JOHN L. HILL**
**ATTORNEY GENERAL**

**AUSTIN, TEXAS 78711**
July 18, 1973

Honorable Ray A. Fowler
Secretary of the Board
Coordinating Board
Texas College and University System
P. O. Box 12788, Capitol System
Austin, Texas 78711

Opinion No. H- 66

Re: Constitutionality of
Tuition Equalization
Grants

Dear Mr. Fowler:

On behalf of the Coordinating Board, you have asked our opinion
as to the constitutionality of Tuition Equalization Grants (Article 2654h,
Vernon's Texas Civil Statutes) in light of the decisions on June 25, 1973,
by the United States Supreme Court of the cases of Committee for Public
Education and Religious Liberty v. Nyquist (hereafter referred to merely
as Nyquist); Sloan v. Lemon (hereafter Sloan); Levitt v. Committee for
Public Education & Religious Liberty (hereafter Levitt); and Hunt v.McNair
(hereafter Hunt).

On May 24, 1973, at the request of the Senate Committee on Finance,
we issued our Letter Advisory No. 47 with reference to then proposed
appropriations for the Tuition Equalization Grants. In that letter we noted
the three tests applied by the United States Supreme Court in judging the
constitutionality of programs designed to aid private education: (1) Does
the legislation have a "secular legislative purpose;" (2) Does its primary
effect either advance or inhibit religion; and (3) Does it foster an excessive
governmental entanglement with religion.

We expressed the opinion in that letter advisory that Article 2654h,
V. T. C. S., was not "on its face" unconstitutional under the Constitution
of the United States or of Texas, the latter being the more stringent of the
two. Our letter concluded:

> "We are of the opinion that Article 2654h, and
> the appropriation of funds for that program, reflect

> a proper secular legislative purpose and are
> constitutional, so long as the Coordinating Board
> under its regulations, administers the program
> so as to avoid the advancement or inhibition of
> religion and so as to avoid the use of public funds
> or property for the benefit of sects, religious
> societies, or theorlogical or religious seminaries,
> in turn avoiding 'excessive entanglements.' "

We urged caution because of the cases before the U.S. Supreme Court which were later decided on June 25, 1973. A review of them follows.

Nyquist involved three programs adopted in New York to aid private education. One provided direct grants to non-public schools for the maintenance of school facilities "to ensure the health, welfare and safety of enrolled pupils." The second provided for tuition reimbursement to parents of children attending nonpublic schools, although there was no limitation on the use of the funds. The third program provided tax relief to those who failed to qualify for tuition reimbursement.

The trial court in Nyquist had relied on statistics from the Levitt case which showed that qualifying institutions under all three segments of the New York plan "could be" ones which imposed religious restrictions on admission, required attendance at religious services, required obedience to the doctrines and dogmas of a particular faith, required students to attend instruction in the theology or doctrine of a particular faith, were an integral part of the religious mission of the church sponsoring it, had as a purpose the inculcation of religious values, imposed religious restrictions of faculty appointments, and imposed religious restrictions on what or how the faculty may teach.

Eighty-five per cent of the qualifying schools were church affiliated. The majority opinion of the Supreme Court by Mr. Justice Powell applied the same three-part test to which we referred in our Letter Advisory No. 47. As to all three segments of the program it found a proper secular purpose. But, when it applied the "effects" test, the program failed. With reference to the "maintenance and repair funds," interestingly, the opinion states:

> "No attempt is made to restrict payments to
> those expenditures related to the upkeep of facilities
> used exclusively for secular purposes, nor do we
> think it possible within the context of these religion-
> oriented institutions to impose such restrictions. . . .
> Absent appropriate restrictions on expenditures for
> these and similar purposes, it simply cannot be denied
> that this section has a primary effect that advances
> religion in that it subsidizes directly the religious acti-
> vities of sectarian elementary and secondary schools."

Distinguishing Everson v. Board of Education, 330 U.S. 1 (1947);
Board of Education v. Allen, 392 U.S. 236 (1968); and Tilton v. Richard-
son, 403 U.S. 672, the Court said:

> "These cases simply recognize that sectarian
> schools perform secular, educative functions as well
> as religious functions, and that some forms of aid
> may be channelled to the secular without providing
> direct aid to the sectarian. But the channel is a nar-
> row one, as the above cases illustrate. . . . [A]n
> indirect and incidental effect beneficial to religious
> institutions has never been thought a sufficient defect
> to warrant the invalidation of a state law."

Turning to the tuition reimbursement segment of the New York law,
the Court held that it, also, failed the "effect" test, even though the pay-
ments were made directly to parents without limitation as to their use.

> "There can be no question that these grants
> could not, consistently with the Establishment
> Clause, be given directly to sectarian schools,
> since they would suffer from the same deficiency
> that renders invalid the grants for maintenance and
> repair. In the absence of an effective means of
> guaranteeing that the state aid derived from public
> funds will be used exclusively for secular, neutral,
> and non-ideological purposes, it is clear from our
> cases that direct aid in whatever form is invalid
> . . . . ." (emphasis added)

Finally the Court found little difference, in effect, between the tuition reimbursement and the tax benefit. All segments were held unconstitutional because of their effect of advancing religion.

Sloan v. Lemon involved reimbursement of parents for expenses incurred in sending their children to nonpublic schools, but without any limitation on the uses to which the funds could be put by the parents. The Supreme Court majority opinion by Justice Powell acknowledged the reality and legitimacy of the legislative purpose, but the court could find no valid basis to distinguish these grants from those held unconstitutional in Nyquist, and held them to be unconstitutional.

Levitt involved another New York statute providing for the reimbursement of nonpublic schools for expenses incurred by them in administering, grading and reporting tests required by State law. The Supreme Court noted that there was no provision for an audit to determine actual costs. Nor did the Act require the return of excess funds. The Supreme Court held that the statute there contained constitutional flaws like some which led to the decision in Nyquist. All three, Nyquist, Sloan, and Levitt were decided at the "effect" level; the "entanglements" level was not reached.

Hunt was the only one of the cases dealing with an institution of higher education and the only one upholding aid. The statute involved, the South Carolina Educational Facilities Act [S. C. Code. Ann. § § 22-41 et seq. (Cum. Supp. 1971)], established an Authority for assisting institutions of higher education in the construction and financing of projects through issuance of revenue bonds. Projects were to encompass buildings and related items but, expressly, would not be used for sectarian activities, etc. State funds were not involved.

The Supreme Court held: A. "The purpose of the statute is manifestly a secular one. The benefits of the Act are available to all institutions of higher education in South Carolina, whether or not having a religious affiliation." B. " . . . On the record in this case there is no basis to conclude that the college's operations are oriented significantly towards sectarian rather than secular education." The "college" was

the Baptist College at Charleston. Its trustees were elected by the South Carolina Baptist Convention. The Convention's approval was required for certain financial transactions, and only the Convention could amend its charter. There were no religious requirements for faculty membership or student admission. About 60 per cent of its student body was Baptist - roughly equivalent to the percentage of Baptists in that area of South Carolina.

The opinion is particularly helpful in defining more explicitly the federal test to be applied in determining whether a program "advances" religion:

> " . . . [T]he Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.

> "Aid normally may be thought to have a primary effect of advancing religions when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise secular setting. . . ."

C. As to "excessive entanglement" the opinion differentiates between elementary schools of "substantiated religious character" such as those involved in the Lemon case, supra, and church-related colleges where, in the words of Chief Justice Burger in Tilton, supra, "There is less likelihood . . . that religion will permeate the area of secular education. " (403 U. S. at 687).

Other language from Chief Justice Burger's opinion in Tilton may be useful in assessing federal requirements.

> "The simplistic argument that every form of financial aid to church-sponsored activity violates

Honorable Ray A. Fowler, page 6 (H-66)

> the Religion Clauses was rejected long ago in
> Bradfield v. Roberts, 175 U.S. 291, 44 L Ed 168,
> 20 S Ct 121 (1899). There a federal construction
> grant to a hospital operated by a religious order
> was upheld. Here the Act is challenged on the
> ground that its primary effect is to aid the reli-
> gious purposes of church-related colleges and
> universities. Construction grants surely aid
> these institutions in the sense that the construc-
> tion of buildings will assist them to perform their
> various functions. Bus transportation, textbooks,
> and tax exemptions all give aid in the sense that
> religious bodies would otherwise have been forced
> to find other sources from which to finance these
> services. Yet all of these forms of governmental
> assistance have been upheld. . . . The crucial
> question is not whether some benefit accrues to
> a religious institution as a consequence of the leg-
> islative program, but whether its principal or pri-
> mary effect advances religion. " (403 U.S. at 679).

The legal concept expressed in our Letter Advisory of May 24 is consistent with the latest opinions and no revision of it is required. A copy of LA-47 is attached and made a part hereof. The opinions rendered by the Supreme Court on June 25th have further illuminated the tests to be applied in deter- mining whether the federal Establishment Clause has been violated. For that reason we have quoted from them extensively. Taking them into con- sideration, we reaffirm our opinion that Article 2654h does not on its face violate the Establishment Clause of the Constitution of the United States, or the Constitution of Texas. It expresses a valid secular purpose and commands the Coordinating Board to promulgate regulations for its imple- mentation which comport with the severe strictures of the Texas Constitution. We cannot assume without evidence that the Coordinating Board has failed or will fail to heed legislative commands. We find no constitutional fault in the statutory concept.

Caution should be used in equating the Hunt case with the Texas Tuition Equalization Program because the Hunt (South Carolina) program differed

significantly. It was funded by revenue bond issues (not direct, recurring appropriations) and in that respect more nearly resembled the Student Loan Program authorized by Article 3 § § 50b and 50b-1 of the Texas Constitution and implemented by the Texas Education Code, § 52. 01, et seq., available to students attending any accredited institution of higher learning in the state, including those publicly owned and operated. Even that resemblance is very limited.

The Hunt program, moreover, like the Tilton case, concerned the construction of "neutral" buildings to be used for separated secular purposes. Students and educational programs are not neuters. Funds used by them cannot be so easily limited to secular or sectarian compartments. Failure to segregate them, however, will likely be fatal under the federal "effects" test; on the other hand, attempts to impose or regulate separation may cause forbidden "entanglements."

Caution is advisable for another reason. Article 1, § 7 of the Texas Constitution is more restrictive than the federal charter (with which Hunt was concerned) and will not tolerate, in our opinion, any aid to sects or sectarian schools. Denominational schools are not necessarily sectarian in that sense, and some schools with sectarian programs may be able to effectively separate their secular programs from the sectarian remainder so that the use of funds for the one does not have the effect of subsidizing or furthering the other. The dividing lines are delicate but must be sharply drawn so that public funds are not put to sectarian uses.

In Church v. Bullock, 100 S. W. 1025 (Tex. Civ. App. , 1907, affirmed 109 S. W. 115), the Court of Appeals approved the following statement as a correct appraisal of the constitutional provision (Article 7, § 5) prohibiting the appropriation of money for the support of sectarian schools:

> "In view of the above decisions and constitutional provisions, we conclude that the words used. . . must have been intended by the people who ratified them to provide against the promulgation or teaching of the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect in schools or institutions where such instruction was to be paid for out of the public fund, or aided by such funds or by public grants;

and that a school or institution is sectarian when
the doctrines or tenets of some particular faith,
sect or religion are taught to the exclusion of others;
and especially so where a school or institution has
a distinctive or strict denominational name, descrip-
tive or indicative of the fundamental doctrines of the
sect to which it belongs, or where a school or insti-
tution is under the exclusive control of a sect having
such a name, and by a course of instruction exclud-
int all others, seeks to inculcate its tenets alone,
it is then sectarian, and it makes no difference that
pupils of all sects, denominations and religious be-
liefs, or those of no belief, are permitted the advan-
tage of such school or institution. It is what is taught
that is the determining factor." (emphasis added)

If and when the constitutionality of Article 4654h is tested before
the courts, the determination of its federal validity will be based on the
three tests we have stated applied to the particular fact situation then
at bar, and its validity under the Texas Constitution will depend upon
facts showing an avoidance of aid to sects and noninterference with
religious rights of conscience.

Such determinations depend upon the characteristics of those to
whom the grants are given, the institutions receiving them, and the uses
to which the funds are put by the institutions. If the Coordinating Board's
regulations are not unconstitutionally permissive, the program will, in
our opinion, survive.

Rules should be so framed that institutions having the character-
istics attributed to the New York schools in Nyquist and in Levitt will not
be the beneficiary of Tuition Equalization Grants. Individual recipients
should not include those, for instance, attending seminaries or divinity
schools, nor should tuition paid from public funds for a student be in
anywise comingled with funds used to defray the cost, expense or upkeep
of sectarian programs or facilities. Mere church sponsorship of an in-
stitution would not seem by itself to be ground for disqualification, but
every possibility of a grant having more than an indirect or incidental
effect upon the advancement of religion must be eliminated.

While the United States Supreme Court appears to find a distinction between the usual parochial school in which religion is, in itself, a reason for being, and the usual church sponsored institution of higher education in which religion plays no significant part in directing the curriculum (perhaps creating a primae facia fact presumption that college programs are not permeated by sectarianism), the presumption of a distinction is a rebuttable one. The mere fact that an institution is a college or university does not call for different tests or rules. A college having all the characteristics of the secondary schools involved in Levitt would be subjected by the U.S. Supreme Court to the same severe limitations, and in Texas no sectarian school, whatever its level, can be the beneficiary of public funds.

## SUMMARY

The Establishment Clause of the U.S. Constitution, as recently interpreted by the United States Supreme Court will not bar all aid to church sponsored institutions and their students, so long as the aid has a proper secular purpose, does not significantly advance or hinder religion, and does not result in excessive entanglements of government in religion. The Texas Constitution prohibits aid to sects but not all denominational institutions are sectarian in the constitutional sense.

Very truly yours,

JOHN L. HILL
Attorney General of Texas

APPROVED:

LARRY F. YORK, First Assistant

DAVID M. KENDALL, Chairman
Opinion Committee